# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1465

_____

Linda S. Cooper,

        Appellant,

        v.

Olin Corporation, Winchester Division,

        Appellee.

        *
        * Appeal from the United States
        * District Court for the
        * Western District of Missouri.

_____

Submitted:  December 11, 2000

Filed:  May 1, 2001

_____

Before WOLLMAN, Chief Judge, RICHARD S. ARNOLD, and HANSEN, Circuit Judges.

_____

WOLLMAN, Chief Judge.

Linda S. Cooper appeals from the district court's grant of summary judgment in favor of her former employer, Olin Corporation (Olin), on her claims under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213, and the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654.  We affirm in part and reverse and remand in part.

# I.

We recite the facts in the light most favorable to Cooper. In 1966, Cooper began working at the Lake City Army Ammunition Plant in Independence, Missouri, and continued to do so until 1997. The plant is operated by private companies under contract with the United States Army. Olin assumed its operation in 1985. Cooper was diagnosed with depression in the 1970s and since that time has been prescribed various treatments and prescription medications, including Xanax in recent years. Olin has had knowledge of her Xanax prescription at least since 1993. In 1988, Cooper became the switch tender for the crew that ran the intra-plant locomotive, which transported raw materials for ammunition as well as the finished product. The train crew consisted of three workers: a locomotive engineer, a conductor, and a switch tender, of class A, B, and C, respectively. When one of the three members of the train crew was missing, the other two would fill in as required. Cooper was promoted to the position of railroad operator A, locomotive engineer, in 1992. In this position she was primarily responsible for operation of the locomotive. Although this job would appear to entail a high level of risk, Cooper had no contact with the ammunition, and she testified regarding the stringent safety measures that minimized the risk. Cooper successfully performed this job, as she had performed her other positions.

During the fall of 1996, Cooper's depression was exacerbated by various personal problems unrelated to her job. She took a series of leaves of absence under the advice of her physician, Dr. Keith Morris, and her counselor, social worker Nancy Peltz. On November 11, 1996, Cooper's health care providers cleared her to return to work, whereupon she reported to Olin's medical department, which reviews, prior to the employee's return to work, the situation of each employee who has taken time off work. Because Olin's medical director, Dr. John Olmstead, was not in the plant's medical department that week, a nurse told Cooper to return on November 18, when Dr. Olmstead would be available.

When Cooper reported to work on November 18, Dr. Olmstead told her that despite the clearance from Dr. Morris and Peltz, she would not be able to operate the locomotive until he was confident that she could safely drive the train, given her condition and medication. Dr. Olmstead said that he would contact her care providers and told Cooper to speak with him again on November 21. In the meantime, Cooper worked at the plant answering phones in the office and working in the scale house as necessary. She received the pay and benefits of her locomotive job and retained her job title. On November 21, Cooper contacted Dr. Olmstead, only to learn that he had not yet spoken with her doctors.

While Cooper was working in the office, several of her co-workers chatted with her and asked why she was not driving the train, which Cooper found to be humiliating and which, together with Dr. Olmstead's continued refusal to allow her to operate the locomotive, she believes caused a relapse of her depression. A series of doctor visits and leaves of absence ensued.

In a December 11, 1996, letter, Dr. Morris released Cooper to return to her position as a locomotive engineer without restriction on the following Monday, December 16, 1996. Peltz wrote a similar statement. On December 12,[1] Cooper reported to Olin's medical department, presenting both of these statements and seeking clearance to return to her position of locomotive engineer. Dr. Olmstead again prohibited Cooper's return to operating the locomotive. He stated that he might want her to contact a psychiatric specialist and then sent her home until December 18. On that date, Cooper was told that she could attend a plant-wide safety day on December 19, but was otherwise not to report to work until after the plant's holiday shutdown, which occurred from December 20, 1996, through January 5, 1997. When the plant reopened on January 6, Cooper, still laboring under restriction, filled in at the plant's

---

[1]Olin operated the plant with a workweek of ten hours per day, four days per week, so Thursday, December 12, 1996, was the final day of that workweek.

office, as she had done in November, which she described as "sit[ting] there useless . . . . ten hours a day sitting in that chair and just maybe answer[ing] the phone half a dozen times." Cooper reported to work for the last time on January 7, 1997. She subsequently took vacation days and then was taken off work by Dr. Morris because of another relapse of her depression.

On January 9, 1997, Dr. Olmstead wrote "Permanent Restriction" on Cooper's medical file. He later stated that the classification of Cooper's restrictions as permanent was based on Olin policy that required such a classification to be made when an employee has been on leave or restricted for a certain period of time. He told Cooper that he would allow her to operate the locomotive in the future if she could get her "depression under control." Cooper called Dr. Olmstead in mid-January and was told by him that Olin would find her another job at the plant but that she would not be allowed to operate the locomotive. From January of 1997 through the spring, Cooper and Dr. Olmstead communicated periodically, but Dr. Olmstead did not lift the restriction, Cooper did not return to work, and Dr. Morris continuously certified that Cooper was unable to work. Cooper went on long-term disability leave in May of 1997. Dr. Olmstead did not speak with either of Cooper's health care providers until March of 1997.

Although Cooper suffered from depression during the relevant time periods, she remained generally functional. Cooper lives alone on a 20-acre plot in a rural area. She stated in her deposition that in recent years she has had up to nine horses and ten dogs at one time and that she generally takes care of her twenty acres of land and her animals herself. Her activities include operating a bulldozer/excavator and a tractor, fixing fences, feeding and grooming the animals, and running necessary errands. She has accepted help from her brother for rebuilding fences and for mowing the land. In a November 1999 affidavit, Cooper stated that during an episode of depression she does the minimum necessary for survival. She also stated that her depression results in a general lack of energy and profound fatigue. "Even with medication," the affidavit

-4-

reports, "my depression had a negative impact on my ability to care for myself and my property."

The district court determined that Cooper had failed to show a genuine issue of material fact on her claims. On her ADA claims, the court found that she failed to make out a prima facie case because she did not show that she is disabled, that she can perform the essential functions of her job, or that she suffered an adverse employment action. The court also rejected her FMLA claim.

We review the district court's grant of summary judgment de novo. Henerey v. City of St. Charles, 200 F.3d 1128, 1131 (8th Cir. 1999). Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Id.; Fed. R. Civ. P. 56(c).

## II.
## A. ADA

The ADA affords protection from discrimination to any "qualified individual with a disability." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, Cooper must show (1) that she has a disability within the meaning of the ADA, (2) that she is qualified to perform the essential functions of her job, with or without reasonable accommodation, and (3) that she suffered an adverse employment action because of her disability. Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc). The proof necessary for discrimination cases is flexible and varies with the specific facts of each case. Young v. Warner-Jenkinson Co., Inc., 152 F.3d 1018, 1022 (8th Cir. 1998).

Under the ADA, disability is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B)

a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). "[W]hether a person has a disability under the ADA is an individualized inquiry." Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999). It is undisputed that Cooper suffers from a mental impairment.

According to the regulations that guide the interpretation of the ADA, an impairment is "substantially limiting" if it renders an individual unable to perform a major life activity that the average person in the general population can perform, or if it significantly restricts the condition, manner, or duration under which an individual can perform such an activity compared to the general population. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working, 29 C.F.R. § 1630.2(i), as well as sitting, standing, lifting, and reaching. Fjellestad v. Pizza Hut of America, Inc., 188 F.3d 944, 948 (8th Cir. 1999). Several factors are considered in determining whether a person is substantially limited in a major life activity: (1) the nature and severity of the impairment; (2) its duration or anticipated duration; and (3) its long-term impact. 29 C.F.R. § 1630.2(j)(2)(i)-(iii). When determining whether an individual is substantially limited in a major life activity, we must take into account mitigating measures such as medication and assisting devices. Sutton, 527 U.S. at 482.

Cooper argues that she is disabled within the meaning of the ADA because (1) her depression substantially limits her in the life activity of caring for herself or, in the alternative, (2) Olin regarded her as impaired in the major life activity of working. Cooper contends that her ability to care for herself is significantly limited in comparison to the general population, noting that during periods of exacerbated depression she does the minimum necessary for survival. She also notes that even on medication, her "affect is depressed generally," she cries more than the general population, and she suffers from fatigue. Olin argues in response that these arguments are based primarily on Cooper's November 1999 affidavit, which contradicts her sworn deposition testimony and thus should not be considered for the purposes of summary judgment,

and that even if the affidavit is considered, Cooper has failed to create a genuine fact issue on her ability to care for herself.

Viewing the facts, including those in the affidavit, in the light most favorable to Cooper, we do not believe that she has presented evidence that shows a material issue of fact on actual disability. Cooper has suffered from depression for more than thirty years, during which she also worked and had raised a family. Her doctors imposed no restrictions when they released her to return to work. Cooper generally takes care of her own finances and operates large machinery. Even during the periods when her depression is most severe, Cooper lives alone and successfully cares for her horses, pets, and farmland. Cooper has presented no evidence that she has substantial difficulty living independently, that she requires help with caring for herself--for example, when she deals with matters of personal care, cooking meals, or taking care of finances--or that she has been substantially limited in her ability to care for her animals and her home. She has not shown that her impairment causes a substantial limitation when compared to the general population. See Cody v. CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 598 (8th Cir. 1998) (difficulties in life that do not hinder performance of required tasks not substantial limitation). We conclude, therefore, that her description of her impairment as causing a "negative impact" is not sufficient to allow an inference of a substantial limitation. See Weber v. Strippit, Inc., 186 F.3d 907, 914 (8th Cir. 1999) (describing moderate limitation as insufficient), cert. denied, 120 S. Ct. 794 (2000).

Cooper also contends that she is actually and substantially limited in the life activity of social interaction. Assuming, without deciding, that interacting socially is a major life activity, we note that although Cooper stated that she "generally avoided speaking to anyone on the phone or socially," she also testified that she has been married twice; that she has regular contact with family members, including her daughter; that she speaks often with her niece; that she visits and chats with friends; and that she talks with people when she runs errands. These facts preclude a finding

that Cooper suffers from a substantial limitation on social interaction. Accordingly, the district court did not err in holding that Cooper is not actually disabled within the meaning of the ADA.

Cooper next argues that Dr. Olmstead, and therefore Olin, regarded her as substantially limited in the life activity of working and thus disabled within the meaning of the ADA. See 42 U.S.C. § 12102(2)(C). To fall within this statutory definition, an individual must show that "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton, 527 U.S. at 489.

To be regarded as substantially limited in the life activity of working, a plaintiff must be regarded as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i); Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 523 (1999) (applying section 1630.2(j)(3) factors to "regarded as" claim). Inability to perform one particular job does not constitute a substantial limitation on working. Id. A plaintiff must show that because of her impairment she has suffered a significant reduction in meaningful employment opportunities. Webb v. Garelick Mfg. Co., 94 F.3d 484, 488 (8th Cir. 1996). Factors to be considered in determining whether a plaintiff is restricted from a class of jobs include the person's expertise, background, and job expectations. Id. at 487; 29 C.F.R. § 1630.2(j)(3)(ii); Taylor v. Nimock's Oil Co., 214 F.3d 957, 960-61 (8th Cir. 2000) (discussing factors such as geographical area, number of hours worked, and whether restrictions were temporary).

Cooper points to Dr. Olmstead's refusal to return her to operating the locomotive, his comments about her depression, and the restrictions he placed on her as evidence that he considered her to be disabled. She argues that every job that she

has held for the past thirty years was at the plant and involved either dealing with the train or explosives or both and that Dr. Olmstead's comments indicated that he viewed her as precluded from the broad class of jobs that she has the skills, training, and experience to perform.

Although Dr. Olmstead restricted Cooper from operating the locomotive, he also stated that the company would find another job for Cooper at the plant. Cooper had been part of the train crew for only five or six of the many years she had spent at the plant. It cannot be concluded from these facts that Dr. Olmstead considered Cooper to be completely precluded from working with explosives generally or from the broad range of jobs involving Cooper's engineering expertise outside of those involving specifically transporting explosives at the plant. See Murphy, 527 U.S. at 524-25 (holding that preclusion from mechanic job that requires commercial motor vehicle license not sufficient to show substantial limitation). Dr. Olmstead's conclusion that Cooper was precluded from her particular locomotive job is not sufficient to indicate that he considered her to be disabled in the activity of working. See id. Moreover, Dr. Olmstead stated several times that he considered Cooper's restrictions to be only temporary while he sought clarification of her condition. Accordingly, we conclude that Cooper has presented insufficient evidence to show a fact issue on whether Olin regarded her as disabled.

## B. FMLA

"[A] desire to promote job security and stability in workplace relationships was central to Congress's decision to pass the FMLA." Stekloff v. St. John's Mercy Health Sys., 218 F.3d 858, 861 (8th Cir. 2000). Under FMLA, eligible employees are entitled to take leave from work for certain family or medical reasons, including a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1); Reynolds v. Phillips & Temro Indust., Inc., 195 F.3d 411, 413 (8th Cir. 1999). Among other prohibitions, FMLA

prohibits an employer from interfering with an employee's exercise of her FMLA rights. 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(b) ("Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act.").

Upon return from FMLA leave, an employee shall be restored to the position she held when the leave began or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. 29 U.S.C. § 2614;[2] Reynolds, 195 F.3d at 414. Section 2614(a)(4) provides that "[a]s a condition of restoration . . . the employer may have a uniformly applied practice or policy that requires each such employee to receive certification from the health care provider of the employee that the employee is able to resume work . . . ." 29 U.S.C. § 2614(a)(4). Thus, in certain circumstances, an employee may be required to obtain a certification from her health care provider that states that she can return to work. Such a certification "need only be a simple statement of an employee's ability to return to work." 29 C.F.R. § 825.310(c). The proper elements of a restoration certification, therefore, differ somewhat from the certification of a serious health condition under 29 U.S.C. § 2613. Although a health care provider employed by the employer may, with the employee's permission, contact the employee's care provider for clarification of the restoration

---

[2] (a) Restoration to position

(1) In general

Except as provided in subsection (b) of this section [providing for highly compensated employees], any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave–

(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or

(B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a).

-10-

certification, "the employer may not delay the employee's return to work while contact" is being made.  Id.

The district court determined that Cooper's depression qualified as a "serious health condition" under FMLA.  The court then concluded that Cooper had failed to raise a genuine issue of material fact on whether she was returned to the same or an equivalent position, because she was not removed from her position nor was her position changed, aside from the restriction on operating the locomotive.  The court then further stated that Olin's refusal to allow her immediately to return to operating the locomotive was not a violation of FMLA because Olin had a duty to inquire and determine Cooper's fitness to resume her duties.

Cooper does not dispute that she continued to retain her job title, classification, pay, and benefits when she returned to work at Olin.  Cooper contends that because the duties and functions of her office assignment were so much different from those of a locomotive engineer, she was not reinstated to the same position within the meaning of FMLA.  She also argues that to any extent that an inquiry into her fitness for duty is permitted, it never occurred.  Olin argues that it did return Cooper to her job within the meaning of FMLA because the pay and benefits were the same and that it could properly restrict her duties while evaluating her fitness for duty.

The first question, then, is whether Cooper's return to work with the title and wages of a locomotive engineer but the job duties of an office assistant constituted restoration to the position of employment she held when she took leave, see 29 U.S.C. § 2614(a)(1)(A).  In Stekloff, in which we determined that an employee could bring a FMLA claim because of her inability to perform her particular job, we pointed out that the FMLA inquiry focuses on the employee's specific job and its duties, not an overall inability to work.  218 F.3d at 861.  To be protected under FMLA when taking leave for the employee's own health condition, an employee must show that she is "unable to perform the functions of [her] position," 29 U.S.C. § 2612(a)(1)(D), which is defined

-11-

as either unable to work at all or unable to perform any one of the essential functions of the employee's position. See Stekloff, 218 F.3d at 862. Additionally, section 2614(a)(1)(B)--restoring the employee to an equivalent position--requires both that the new position come with equivalent benefits and terms and that it be an "equivalent position," indicating that the duties and functions of the job, as well as the pay, terms, and benefits, are to be considered. 29 U.S.C. § 2614(a)(1)(B); see also 29 C.F.R. § 825.215. Accordingly, the restoration of salary, title, and benefits does not necessarily constitute restoration to the same position within the meaning of section 2614(a)(1)(A) when the job duties and essential functions of the newly assigned position are materially different from those of the employee's pre-leave position.

Regarding the question of fitness for duty, Olin does not dispute that in November and December of 1996, and in January of 1997,[3] Cooper reported to Olin's medical department with releases from her health care providers, Dr. Morris and Peltz, that unambiguously stated that she could return to work without restriction. Indeed, Dr. Morris's December 11 letter notes that Cooper's position was that of a locomotive engineer. At this point, Olin had a right, with Cooper's permission, to seek clarification from her health care providers about these certification statements, which may have, in essence, rebutted the certification. See 29 C.F.R. § 825.310(c). For whatever reason, whether it was the result of a failure of communication or of bureaucratic bungling, Olin did not follow through and obtain such clarification. In the meantime, Cooper was entitled to be restored to her position or to an equivalent position. Inasmuch as Cooper was not returned to her position, on remand the fact-finder must determine whether Cooper's office assignment was an equivalent position within the meaning of FMLA. "Equivalent" under FMLA means "that which is substantially equal or similar, not necessarily identical or exactly the same. The employer may take into account the employee's physical capabilities in determining the equivalent work

---

[3]In its brief, Olin states in a footnote that Cooper's FMLA eligibility expired on December 22, 1996. We express no opinion on this assertion.

and compensation involved." <u>Watkins v. J & S Oil Co., Inc.</u>, 164 F.3d 55, 59 (1st Cir. 1998); <u>see also</u> 29 C.F.R. § 825.215(a) ("An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.").

The summary judgment dismissing Cooper's ADA claims is affirmed. The grant of summary judgment dismissing Cooper's FMLA claim is reversed, and the case is remanded to the district court for further proceedings.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.