208 F.Supp.2d 1013 (2002)
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff(s),
v.
EXEL, INC., f/k/a EXEL LOGISTICS, INC., Defendant(s).
No. 4:01CV154 JCH.
United States District Court, E.D. Missouri, Eastern Division.
June 21, 2002.
*1014 Robert G. Johnson, Donna L. Harper, Melvin D. Kennedy, Gwendolyn Young Reams, Anne E. Gusewell, St. Louis, MO, for Plaintiff.
James N. Foster, Jr., William B. Jones, McMahon and Berger, St. Louis, MO, for Defendant.

MEMORANDUM AND ORDER
HAMILTON, District Judge.
This matter is before the Court on Defendant's Motion for Summary Judgment and Request for Fees and Costs Pursuant to 42 U.S.C. § 12205, filed April 5, 2002. (Doc. No. 79). The matter is fully briefed and ready for disposition.

BACKGROUND
Charging Party Alan Gray ("Gray") became a full-time employee of Exel on or about October 26, 1986. (Defendant's Statement of Uncontroverted Material Facts ("Defendant's Facts"), ¶ 1, citing Defendant's Att. 1). Gray worked as a warehouse operator[1] in Defendant Exel, Inc.'s ("Defendant" or "Exel") warehousing and distribution center in St. Peters, Missouri. (Defendant's Facts, ¶¶ 1, 2, citing Defendant's Att. 1; Aldon Woolley Deposition ("WD"), P. 5). At the time of Gray's termination, Aldon Woolley ("Woolley") was the General Manager of the St. Peters facility. (Defendant's Facts, ¶ 2, citing WD, P. 5).
The St. Peters facility is a four hundred thousand (400,000) square foot facility that warehouses soap products exclusively for customer Unilever Home and Personal Care Operations of North America Corporation. (Defendant's Facts, ¶ 4, citing WD, PP. 5-6; Alan Gray Deposition ("PD"), P. 34). The weight of the warehoused products at the St. Peters facility varies from five (5) to one-hundred (100) pounds. (Defendant's Facts, ¶ 5 (citations omitted)). According to the job description, the essential functions of the warehouse operator position are as follows:
* Moving product, which requires associate to get on and off equipment repeatedly throughout the shift. This requests [sic] bending, stretching, stepping, reaching, and stooping.
* Loading and unloading product weighing up to 100 pounds.
* Performing duties which requires [sic] sitting, standing, or a combination for up to eight hours.

*1015 * Ability to identify, locate, and disburse product which requires reading, counting, performing simple math calculations, printing product name and code on applicable documents.
* Moving product which requires the operation of various machinery requiring eye, hand, and foot coordination.
* Ability to learn technical material to accomplish necessary objectives.
(Defendant's Facts, ¶ 6, quoting Defendant's Att. 3; WD, PP. 7, 42-48; Robert Moore Deposition ("RMD"), PP. 56-59; Steve Plank Deposition ("SPD"), PP. 18-20).[2]
In 1996, the amount of time spent by a forklift operator off the forklift, performing lifting duties, varied from day to day. (Defendant's Facts, ¶ 7, citing John Turner Deposition ("TD"), PP. 22-24, 27; RMD, PP. 32-37; WD, PP. 11-12; SPD, P. 14). Plaintiff admits that Gray was required to lift in excess of twenty-five (25) pounds repeatedly, and that there was no way to avoid heavy lifting (fifty (50) pounds) in his job at Exel. (Defendant's Facts, ¶ 8, citing PD, PP. 95-96, 148). Plaintiff further admits that Gray was required to get off the forklift repeatedly throughout his shift to shrink wrap pallets manually, which required repeated bending and reaching. (Defendant's Facts, ¶ 9, citing PD, PP. 75-78, 147-48; WD, PP. 7-9; SPD, PP. 8-21, 46-47; TD, PP. 14-15, 22-24; RMD, PP. 30-32). Plaintiff further admits that forklift operators were required constantly and repetitively to twist while operating the forklift, and that there was no way to avoid such repetitive twisting at the lower back. (Defendant's Facts, ¶ 11, citing PD, PP. 95, 134, 330-335; WD, PP. 17-18; TD, PP. 13-14; SPD, PP. 21-22; RMD, PP. 26-28; Defendant's Att. 4).
On or about March 3, 1995, Gray injured his back in the performance of his duties at Exel (lifting a propane tank), and filed a report of injury and workers' compensation claim. (Defendant's Facts, ¶ 16, citing Defendant's Att. 6). As part of his workers' compensation claim, Gray filed various claims against the second injury fund for other back injuries he had allegedly endured during the course of his employment at Exel, as follows:
(a) 7-30-87injury to the sacroiliac (lower back);
(b) 12-26-91injury to the upper back, neck and shoulders;
(c) 2-21-92injury to the left mid-back (while driving forklift in reverse and lifting);
(d) 7-12-93injury to the right mid-back and lower back (lifting propane tank).
(Defendant's Facts, ¶ 17, citing Defendant's Atts. 6, 8, 9).[3]
As a result of his March 3, 1995 work injury, and at the request of Defendant's workers' compensation carrier, Gray went to see Dr. Charles Mannis on or about March 20, 1995. (Defendant's Facts, ¶ 20, citing Defendant's Att. 5). Dr. Mannis treated Gray for his back injury and pre-existing spinal stenosis (diagnosed by Dr. Mannis on or about May 5, 1995), and referred Gray to a functional capacity evaluation and work hardening program in the *1016 spring/summer of 1995. (Defendant's Facts, ¶ 21, citing Defendant's Att. 5). Dr. Mannis further ordered a magnetic resonance imaging ("MRI") study to be conducted on Gray's lower back, and that study enabled him to diagnose Gray's spinal stenosis. (Defendant's Facts, ¶ 21, citing Defendant's Att. 5). Dr. Mannis returned Gray to full duties at his job at Exel on or about June 26, 1995, and released Gray from his care in November, 1995. (Defendant's Facts, ¶ 22, citing Defendant's Att. 5).
On or about September 3, 1996, Gray returned to Dr. Mannis, complaining of pain in his back and radiating to his legs. (Defendant's Facts, ¶ 22, citing Defendant's Att. 5). Dr. Mannis reviewed an x-ray of Gray's lower back on that date, placed Gray on anti-inflammatory medication, and suggested that Gray use heat and/or ice on his lower back and wear a back brace at work. (Defendant's Facts, ¶ 23, citing Defendant's Att. 5). On September 17, 1996, Gray returned to Dr. Mannis for a follow-up visit, and complained of increased pain, particularly in his right leg. (Defendant's Facts, ¶ 24, citing Defendant's Att. 5). Dr. Mannis ordered an epidural steroid injection for Gray's lower back, and instructed him to remain off work pending a follow-up visit after the injection. (Id.).
Gray underwent the epidural steroid injection on September 24, 1996, and returned to Dr. Mannis for a follow-up visit on September 27, 1996. (Defendant's Facts, ¶¶ 25, 26, citing Defendant's Att. 5). At that time, Gray continued to complain of back and leg pain; Dr. Mannis therefore recommended that Gray remain off work, undergo a second epidural steroid injection, and participate in physical therapy. (Defendant's Facts, ¶ 27, citing Defendant's Att. 5).
When Gray returned to Dr. Mannis' office on October 14, 1996, he continued to complain of back and leg pain, and so he underwent an additional epidural steroid injection on October 15, 1996. (Defendant's Facts, ¶¶ 29, 30, citing Defendant's Att. 5). In a follow-up visit with Dr. Mannis on October 21, 1996, Gray reported no improvement; Dr. Mannis thus advised Gray to remain off work, and ordered an additional MRI of Gray's lower back. (Defendant's Facts, ¶¶ 31, 32, citing Defendant's Att. 5).
Dr. Mannis' review of the MRI revealed spinal stenosis on a congenital basis, as well as possible nerve root entrapment. (Defendant's Facts, ¶ 33, citing Defendant's Att. 5). The MRI was somewhat unclear, however, and so Dr. Mannis ordered additional screening of Gray's back, in the form of a myelogram and post-myelographic CT scan. (Id.). On November 4, 1996, Gray returned to Dr. Mannis with persistent complaints of back and leg pain. (Defendant's Facts, ¶¶ 34, 35, citing Defendant's Att. 5). In his review of the myelogram and CT scan, Dr. Mannis noted spinal stenosis, particularly severe at the L4-5 vertebrae, and very limited filling of the nerve roots due to the spinal stenosis. (Defendant's Facts, ¶ 35, citing Defendant's Att. 5). At that time, Dr. Mannis suggested that Gray change his activity pattern and seek vocational rehabilitation. (Defendant's Facts, ¶ 36, citing Defendant's Att. 5). Specifically, Dr. Mannis indicated that Gray could return to work "if appropriate light duty activities are available." (Defendant's Facts, ¶ 37, citing Defendant's Att. 5).
On November 18, 1996, Doris Smith, a representative of Cigna, Defendant's workers' compensation insurance carrier, sent correspondence to Dr. Mannis. (Defendant's Facts, ¶ 39, citing Defendant's Att. 12). Ms. Smith attached a copy of Gray's job description, and requested Dr. Mannis' opinion regarding Gray's ability to perform his job at Exel. (Id.).
*1017 In response, Dr. Mannis reviewed Gray's job requirements on November 19, 1996, and assessed the appropriateness of Gray's continuing in the position of forklift operator at Exel, given the current condition of his lower back.[4] (Defendant's Facts, ¶ 40, citing Defendant's Att. 5). At that time, Dr. Mannis found that Gray's job at Exel was not appropriate for him, as the requirements of the position exceeded the physical restrictions necessitated by the condition of his lower back. (Defendant's Facts, ¶ 40, citing Defendant's Att. 5; PD, PP. 305-06). Dr. Mannis therefore again recommended that Gray avoid certain work activities, and seek vocational rehabilitation. (Id.).
As a result of Dr. Mannis' assessment Aldon Woolley, General Manager of Exel's St. Peters facility, met with Gray on December 2, 1996. (Defendant's Facts, ¶ 41). During that meeting, Woolley provided Gray both the record from Dr. Mannis, and an application for short-term disability leave, which Gray signed. (Id., citing WD, PP. 55-57; PD, PP. 326-28; Defendant's Atts. 13, 14).
In a follow-up appointment with Gray on December 4, 1996, Dr. Mannis once again explained the need for permanent restrictions on his work activity. (Defendant's Facts, ¶ 42, citing Charles Mannis Affidavit ("MA"), ¶ 15; MD, PP. 88-89; Defendant's Att. 5). When Gray insisted he could perform his job at Exel Dr. Mannis, against his better medical judgment, relented, and provided Gray with a release to return to work without restrictions.[5] (Id.).
That same day, Dr. Mannis informed someone associated with Defendant Employer that he had given Gray a release to full duty without restriction.[6] (Defendant's Facts, ¶ 43, citing Defendant's Att. 5). Following this discussion, the contents of which are disputed by the parties, Dr. Mannis informed Gray he could only return to his forklift operator position with the following permanent restrictions on his work activity:
It is my opinion, therefore, that Mr. Gray should work only with permanent restrictions which would include avoidance of heavy lifting on a repetitive basis, avoidance of repetitive twisting and climbing and standing or walking for approximately no more than three hours at a time.
(Defendant's Facts, ¶ 44, quoting Defendant's Att. 5).[7] Dr Mannis testified that he returned to his best medical judgment *1018 based primarily upon the significant problems indicated in the lumbar myelogram, CT scan, and MRI conducted on Gray's lower back.[8] (Defendant's Facts, ¶ 45; MD, PP. 89-90).
On December 4, 1996, Gray sent correspondence to Woolley, as follows:
This letter is to advise[] you that I would very much like to continue to work for Exel. In citing the Americans with Disabilities Act, I am requesting that I be allowed to return to work; either by performing my regular duties (in that my job required very little, if any lifting) or in some other capacity. I would be agreeable to taking disability leave; while you consider the various options regarding this matter and we reach a mutually agreeable solution.
I would also like to participate in the Vocational Rehab Training as this will enhance my ability for meeting the qualifications of another position, with Exel.
(Defendant's Facts, ¶ 46, quoting Defendant's Att. 15). On December 9, 1996, Woolley sought clarification from Dr. Mannis as to whether Gray could perform his duties without permanent restriction, as follows[9]:
I just received your medical report for Alan J. Gray, dated Dec. 4, 1996 and need clarification based on conflicting information contained in your report of November 19, 1996. In the November report you indicate that the patient should seek vocational rehabilitation as he would be unable to continue in his present position of warehouseman/forklift operator. This position requires bending, stretching, stepping, reaching and stooping. The associate also must get on and off equipment repeatedly throughout the shift. Finally, the associate must perform duties which require[] sitting, standing, or a combination for up to eight hours.
The report of December 4 indicates that Mr. Gray should only work with permanent restrictions. This is in direct conflict with your previous report....
I recognize you have attempted in the second evaluation to provide some latitude to the patient on whether he should or should not continue to work in his current job. However, I need you to clear up this apparent conflict in evaluations and advise me if Mr. Gray can or cannot continue his present position based on the duties outlined in paragraph one. If the duties cannot be done at 100% (one-hundred percent) then logically the associate cannot perform his present duties.
Please advise me in writing your determination of the associate's work status and clarification of the apparent conflicting medical evaluation reports.
(Defendant's Facts, ¶ 47; Defendant's Att. 16). In response, on December 9, 1996, Dr. Mannis recommended the following permanent restrictions for Gray:
For clarification, it is my opinion that Mr. Gray should have permanent restrictions upon his return to work. My recommendations would be that he avoid working in a capacity which would include repetitive bending, heavy lifting, twisting.[10] Sitting and standing do not *1019 necessarily need to be restricted to any significant extent. I would suggest that walking for prolonged periods of time also be avoided.
(Defendant's Facts, ¶ 48, quoting Defendant's Att. 5).
On December 18, 1996, Woolley informed Gray in writing that, based on Dr. Mannis' evaluation, Exel could not assign him to warehouseman duties. (Defendant's Att. 17). Woolley proposed two alternative options, as follows:
A. We can offer you full-time employment as a Security Attendant in our Welcome Center. The hours would be 8:00 p.m. to 4:30 a.m. Monday through Friday at a starting pay of $8.50/hour. You would retain your current vacation benefits and health/dental/life insurance eligibility. This position requires check-in/check-out of trailers, dock door or parking assignments, and general administrative file maintenance using the WMS computer system. Additionally, incumbents must control bill of lading paperwork and coordinate closely with droplot spotters, truck drivers, other clerical staff and/or supervision, and provide general entry/exit security. The position requires approximately 90% sitting and 10% standing. Inhouse training would be provided.
B. If option A is unacceptable then you will continue on short-term disability status for up to 26 weeks unless new employment is found. We will provide contact information for your enrollment in vocational rehabilitation training. If required, we will provide financial assistance up to $1,000 (one thousand) for this training.
(Defendant's Att. 17). On December 26, 1996, Gray responded to Woolley as follows:
I am in receipt of your letter dated. You are advised that I am unable to accept either one of your proposals. As you know, $8.50 is considerably lower than the pay I was previously receiving and I know from what I am getting for disability that I cannot possibly live off of such a reduction in pay. Also, the hours are extremely odd. What I will accept is being allowed to return to my regular job. As long as I feel that [I] am able to perform my job, I should be given that opportunity. Doctor's statement merely indicate that I should not do any lifting, bending or twisting; these are things that I have rarely been required to do as a function of my job.[11] Therefore, there would be minimal, if any, accommodation required on Exel's part.
"I have contacted the EEOC wherein I was advised to file a claim against the company. I have a right to `reasonable' accommodations and that I cannot be denied my job because I may have a disability. I am once again requesting that I be allowed to return to work."
(Defendant's Facts, ¶ 56, quoting Defendant's Att. 18). In response, on December 30, 1996, Woolley sent correspondence to Gray offering to address his concern over the impact of the wage decrease by incrementally reducing Gray's current pay rate as a forklift operator to that of a security guard over a three (3) month period. (Defendant's Facts, ¶ 57; Defendant's Exh. CCC, attached to Defendant's Reply Memorandum *1020 in Support of Defendant's Motion for Summary Judgment and Request for Fees and Costs Pursuant to 42 U.S.C. § 12205 ("Defendant's Reply")). Woolley further indicated in this letter that neither he nor Exel considered Gray to be a disabled person within the meaning of the Americans with Disabilities Act; rather, Woolley stated that the Company could not accommodate Gray's permanent medical restrictions in positions other than the security guard job. (Id.). Woolley finally extended Gray's time in which to respond to Defendant's offer to January 10, 1997. (Id.). Gray did not respond to the December 30, 1996 correspondence[12], and his employment with Exel terminated with the expiration of his short-term disability leave benefit on May 2, 1997.[13] (Defendant's Facts, ¶¶ 61, 62, citing PD, PP. 464-66; Defendant's Att. 20).
On or about December 24, 1996, Gray sent a Charge Questionnaire Form to the EEOC. (Defendant's Facts, ¶ 79, citing Defendant's Att. 25). Gray acknowledged in his Questionnaire that he had requested both a transfer of position and vocational rehabilitation training from Exel. (Defendant's Facts, ¶ 82, citing Defendant's Att. 25). On or about April 27, 1997, Gray filed a Charge of Discrimination ("Charge") with the EEOC, alleging as follows:
I. I was denied reasonable accommodation and placed on disability leave despite the fact that my doctor has released me to full duty.
II. The company has given me no explanation for this unfair treatment.
III. I believe I have been discriminated against in violation of the Americans With Disabilities Act (ADA).
(Defendant's Facts, ¶ 86, quoting Defendant's Att. 28). On June 25, 1997, Exel submitted its Statement of Position to the EEOC, in which it reiterated its position that Woolley did not consider Gray to be statutorily disabled, i.e., a person whose medical condition prevented him from performing a broad range of jobs. (Defendant's Att. 29).
After terminating its efforts to conciliate Gray's Charge in December, 1998, the EEOC filed a Complaint in this Court on January 31, 2001, alleging that Exel discriminated against Gray by perceiving him to be disabled. (Defendant's Facts, ¶ 115, citing Complaint). On April 12, 2001, the EEOC filed an Amended Complaint, alleging that Exel unlawfully regarded Gray as having an impairment that substantially impaired him in the major life activity of working. (Defendant's Facts, ¶¶ 118, 119, citing Amended Complaint).

SUMMARY JUDGMENT STANDARD
The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine *1021 issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.
A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R.Civ.P. 56(e); Anderson, 477 U.S. at 247, 106 S.Ct. 2505. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 256, 106 S.Ct. 2505.
In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. Id. at 255, 106 S.Ct. 2505. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Id. at 249, 106 S.Ct. 2505.

DISCUSSION
The Americans with Disabilities Act of 1990, 42 U.S.C. 12101 et seq. ("ADA") prohibits employers from discriminating against qualified individuals with a disability on the basis of such disability. Brunko v. Mercy Hospital, 260 F.3d 939, 941 (8th Cir.2001), citing 42 U.S.C. § 12112(a). In order to establish a prima facie case of employment discrimination under the ADA,[14] Plaintiff must show that (1) he has a disability within the meaning of the ADA, (2) he is qualified to perform the essential functions of the job, with or without reasonable accommodation, and (3) he suffered an adverse employment action because of his disability. Conant v. City of Hibbing, 271 F.3d 782, 784 (8th Cir.2001), citing Cooper v. Olin Corp., Winchester Div., 246 F.3d 1083, 1087 (8th Cir.2001). If Plaintiff meets his burden of establishing a prima facie case of disability discrimination, a rebuttable presumption of discrimination emerges, and Defendant *1022 must articulate a legitimate, nondiscriminatory reason for the adverse employment action. Kellogg v. Union Pacific Railroad Co., 233 F.3d 1083, 1086 (8th Cir.2000), citing Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1135 (8th Cir.1999) (en banc). If Defendant successfully rebuts the presumption, then Plaintiff must demonstrate that Defendant's nondiscriminatory reason was merely a pretext for discrimination. Kellogg, 233 F.3d at 1086 (citation omitted).
To establish a disability under the ADA, Plaintiff must demonstrate that: "(A) he is physically or mentally impaired such that he is substantially limited in one or more major life activity; (B) he has a record of such an impairment; or (C) he is regarded as having such an impairment.'" Kellogg, 233 F.3d at 1086-87, citing 42 U.S.C. § 12102(2).[15] "`Major life activities' include `caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" Conant, 271 F.3d at 784 (quoting 29 C.F.R. § 1630.2(i)). Further, "[w]hen referring to the major life activity of working, the EEOC defines `substantially limits' as: `significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" Murphy v. UPS, Inc., 527 U.S. 516, 523, 119 S.Ct. 2133, 2138, 144 L.Ed.2d 484 (1999) (quoting 29 C.F.R. § 1630.2(j)(3)(i) (1998)). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i).

A. Plaintiff's Prima Facie Case

As noted above, "[t]o establish a prima facie case of discrimination under the ADA, [Plaintiff] must show that (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job, with or without accommodation; (3) and he suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." Galambos v. Fairbanks Scales, 144 F.Supp.2d 1112, 1124 (E.D.Mo. 2000), citing Allen v. Interior Construction Serv., Ltd., 214 F.3d 978, 980-81 (8th Cir. 2000).
In its Amended Complaint, Plaintiff alleges that Gray was disabled within the meaning of the ADA because Defendant regarded him as disabled; in other words, Plaintiff maintains that Defendant unlawfully regarded Gray as having a physical impairment that substantially limited him in the major life activity of working. (Amended Complaint, P. 3). The Eighth Circuit recently addressed a similar claim in Conant v. City of Hibbing, supra. In that case, a doctor conducting a preemployment physical examination instructed that the plaintiff should not lift more than thirty pounds, or repeatedly squat or bend. Conant, 271 F.3d at 784. Based on this report, the defendant City decided that Conant was not qualified for the position of General Laborer.[16]Id. Conant then sued, claiming the City violated the ADA by *1023 refusing to hire him because it perceived him to be disabled. In discussing the claim, the Eighth Circuit elaborated upon the statutory meaning of "regarded as disabled" as follows:
In "regarded as" actions, the plaintiff must show that the employer or potential employer "entertain[ed] misperceptions about the individual  it must [have] believe[d] either that one ha[d] a substantially limiting impairment that one [did] not have or that one ha[d] a substantially limiting impairment when, in fact, the impairment [was] not so limiting."... This court has repeatedly held that the type of work restriction at issue in this case does not amount to a "disability" within the meaning of the ADA.... It logically follows then that being regarded as having a limiting but not disabling restriction also cannot be a disability within the meaning of the ADA.
Conant, 271 F.3d at 785 (internal citations omitted).
In the instant case, Dr. Mannis placed the following permanent restrictions on Gray's work activities: "My recommendations would be that he [Gray] avoid working in a capacity which would include repetitive bending, heavy lifting, twisting." (Defendant's Att. 5, P. 44).[17] These restrictions are almost identical to those imposed in Conant, and thus do not constitute a disability within the meaning of the ADA. Conant, 271 F.3d at 785 (citations omitted). It follows then that, as in Conant, Plaintiff cannot establish Gray was disabled within the meaning of the ADA by showing that Defendant regarded him as having these "limiting but not disabling" restrictions. Id.
Plaintiff's claim ultimately fails, however, because it has adduced no evidence indicating that Defendant perceived Gray as having an impairment that significantly restricted his ability to perform the major life activity of working. Conant, 271 F.3d at 785 (citations omitted). "The provision addressing perceived disabilities `is intended to combat the effects of `archaic attitudes,' erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities.'" Brunko, 260 F.3d at 942 (quoting Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir.1995)). In the instant case, Defendant's perception that Gray was incapable of performing the forklift operator position was not based on myths or archaic attitudes about the disabled; rather, it was based on Gray's treating physician's (Dr. Mannis') recommendation that Gray not engage in repetitive bending, heavy lifting, or twisting, all of which were admittedly necessary functions of the position. Brunko, 260 F.3d at 942; see also WA, ¶ 4 ("I made this decision based solely on the workers' compensation insurance carrier's doctor's opinion that [Gray] should not perform the job due to the condition in his lower back").
In addition, the Eighth Circuit has stated that "[t]here is a distinction between being regarded as an individual unqualified for a particular job because of a limiting *1024 physical impairment and being regarded as `disabled' within the meaning of the ADA." Conant, 271 F.3d at 785. In the instant case, the record is bereft of any evidence indicating that Defendant perceived Gray as anything more than unable to perform the particular job of warehouse operator.[18]Id. To the contrary, Defendant actually offered Gray another position of employment that it believed to be more compatible with Gray's medical restrictions. (Defendant's Att. 17). "An employer that regards an individual as having an impairment that disqualifies him or her from a narrow range of jobs does not regard him or her as substantially limited in the major life activity of working." EEOC v. Woodbridge Corp., 263 F.3d 812, 816 (8th Cir.2001) (citation omitted). Under these standards, Plaintiff fails to demonstrate Defendant regarded Gray as disabled within the meaning of the ADA, and thus cannot establish a prima facie case of disability discrimination.

B. Defendant's Legitimate, Non-Discriminatory Reason For The Adverse Employment Action

Despite the above holding that Plaintiff fails to present a prima facie case of disability discrimination, the Court will nevertheless continue to discuss the remaining factors under the McDonnell Douglas burden-shifting scheme. As stated above, once Plaintiff establishes a prima facie case of disability discrimination, then Defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action. Kellogg, 233 F.3d at 1086 (citation omitted). In the instant case, Defendant cites its reliance on Dr. Mannis' medical opinions and placement of permanent restrictions on Gray's work activities as justification for its action. (Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment and Request for Fees and Costs Pursuant to 42 U.S.C. § 12205, P. 35; see also Brunko, 260 F.3d at 942). With this explanation, the Court finds that Defendant successfully presents a legitimate, non-discriminatory reason for its employment decision.

C. Pretext

Defendant having proffered a non-discriminatory reason for the adverse employment action, the burden then shifts back to Plaintiff to present evidence that Defendant's reason was pretextual. Kiel v. Select Artificials, Inc., 169 F.3d at 1135. As evidence of pretext, Plaintiff asserts that Defendant's articulated legitimate, non-discriminatory reason for the employment action is false. Specifically, Plaintiff maintains that Defendant could not have relied on Dr. Mannis' medical opinions and placement of permanent restrictions on Gray's work activities as justification for its action because Dr. Mannis in fact advised Defendant that Gray was capable of performing his job without restriction. (Plaintiff's Memo in Opp., PP. 14-15). According to Plaintiff, Dr. Mannis imposed his permanent restrictions on Gray's work activities only after Defendant itself contacted Dr. Mannis with false information regarding Gray's medical history. (Id., P. 15).
Upon review of the record, the Court finds that Plaintiff's evidence of pretext fails because, as noted above, Dr. Mannis placed almost identical restrictions on Gray's work activities before Defendant Company's alleged attempt at coercion. See footnote 17, supra.[19] Thus, as early as November, 1996, Defendant employer was *1025 notified that Gray could not continue in a position that required repetitive bending and lifting (Defendant's Att. 5, P. 39), and Gray himself admitted that he could not perform his job duties at Exel with those restrictions in place. (PD, PP. 148, 332-33). Further, while it is true Dr. Mannis released Gray to work without restriction in December, 1996, he has consistently maintained that he did so against his better medical judgment.[20] (Defendant's Att. 5; MD, PP. 89-90). Thus, upon careful consideration the Court finds that Plaintiff fails to create a fact issue as to whether Defendant's stated legitimate, non-discriminatory reason for its action was a pretext for disability discrimination. Defendant's Motion for Summary Judgment with respect to Plaintiff's ADA claim will therefore be granted.[21]

CONCLUSION
Accordingly,
IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment and Request for Fees and Costs Pursuant to 42 U.S.C. § 12205 (Doc. No. 79) is GRANTED in part and DENIED in part.
IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment (Doc. No. 79) is GRANTED. An appropriate Judgment will accompany this Memorandum and Order.
IT IS FURTHER ORDERED that Defendant's Request for Fees and Costs Pursuant to 42 U.S.C. § 12205 (Doc. No. 79) is DENIED.
IT IS FURTHER ORDERED that Defendant's Motion for Sanctions (Doc. No. 91) is DENIED.
IT IS FURTHER ORDERED that Defendant's Motion to Strike the Report and Testimony of James E. Israel (Doc. No. 93) is DENIED as moot.
IT IS FURTHER ORDERED that Defendant's Motion for Leave of Court to File a Memorandum in Excess of Fifteen (15) Pages (Doc. No. 94) is DENIED as moot.
IT IS FURTHER ORDERED that the Parties' Joint Motion to Extend the Deadline for the Filing of Motions in Limine and Objections to Pretrial Submissions (Doc. No. 99) is DENIED as moot.
NOTES
[1] The terms "warehouse operator" and "forklift operator" are used interchangeably in this Memorandum and Order.
[2] While Plaintiff EEOC "denies that there has been testimony as to which of the job functions listed in paragraph 6 were essential to the performance of the warehouse operator job" (Plaintiff's Response to Defendant's Statement of Uncontroverted Material Facts ("Plaintiff's Facts"), ¶ 6), the Court notes that Plaintiff's co-worker, Stephen Plank, testified specifically as to the accuracy of the stated essential job functions. (SPD, P. 20).
[3] Gray filed an additional report of injury regarding his back on July 25, 1994 (lifting a dock door). (Defendant's Facts, ¶ 18, citing Defendant's Att. 10).
[4] Plaintiff denies that Dr. Mannis assessed Gray's ability to perform the warehouse operator duties "as they were actually being performed in the warehouse in 1996." (Plaintiff's Facts, ¶ 40, citing Charles Mannis Deposition ("MD"), PP. 98-99; WD, PP. 58, 61-63, 66-67). As noted above, however, Gray's co-worker testified as to the accuracy of the job description and essential job functions (SPD, PP. 18-20), and Plaintiff offers no evidence to contradict this testimony.
[5] Plaintiff denies that when Dr. Mannis released Gray to return to work without restrictions, he did so against his better medical judgment. (Plaintiff's Facts, ¶ 42). Plaintiff does so without any support from the record, however, and Defendant correctly notes that the medical record, Dr. Mannis' deposition testimony, and his affidavit all establish that when he released Gray to work without restrictions, he did so against his better medical judgment. (Defendant's Reply to Plaintiff's Response to Defendant's Statement of Uncontroverted Material Facts ("Defendant's Reply Facts"), ¶ 8, citing Defendant's Att. 5; MD, PP. 89-90).
[6] Plaintiff contends the recipient of this information was Woolley, and Defendant does not dispute that identification for purposes of this motion. (Defendant's Facts, ¶ 43).
[7] Dr. Mannis further opined that, "if Mr. Gray continues to work without restrictions he is risking further injury and deterioration of the condition of his lower back." (Defendant's Att. 5).
[8] As stated above, Plaintiff denies that Dr. Mannis' reversal represented a return to his better judgment. (Plaintiff's Facts, ¶ 45).
[9] Without explanation or support from the record, Plaintiff denies that Woolley's intent was merely to seek clarification from Dr. Mannis. (Plaintiff's Facts, ¶ 47).
[10] In his deposition, Gray admitted that his job required repetitive twisting at the lower back, repetitive bending at the waist, and repetitive lifting of items weighing at least twenty-five (25) pounds. (Defendant's Facts, ¶¶ 51-54, citing PD, PP. 148, 332-33). Gray further admitted that if Defendant Company honored the restrictions imposed by Dr. Mannis, it could not return him to his position at Exel. (Defendant's Facts, ¶ 55, citing PD, PP. 332-33).
[11] As noted above, Gray admitted in his deposition that his job in fact required repetitive lifting, bending and twisting. See footnote 10, supra.
[12] Plaintiff notes that while Gray did not respond directly to Woolley, he responded by pursuing his claim of employment discrimination. (Plaintiff's Facts, ¶ 61).
[13] Woolley testified that in making his decisions regarding Gray's employment, he considered only the medical opinions of Dr. Mannis. (Defendant's Facts, ¶ 58, citing Woolley Affidavit ("WA"), ¶ 4). Woolley further testified that he considered only the forklift operator job when making his decisions, and that he did not consider Gray to be substantially limited in his ability to perform a broad class of jobs, or a broad range of jobs across various classes. (Defendant's Facts, ¶¶ 59, 60, citing WA, ¶¶ 10-11, 15-16). While Plaintiff disputes these assertions, it does so without citation to the record, and Gray himself acknowledged in his Charge Questionnaire that he believed the Company took the actions it did "because of the doctor's statement." (Plaintiff's Facts, ¶¶ 58-60; Defendant's Att. 25).
[14] In its Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Memo in Opp."), Plaintiff argues that his evidence of disability discrimination should be analyzed under the direct evidence standard established by the United States Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). (Plaintiff's Memo in Opp., PP. 3-10). Plaintiff offers the following as "direct" evidence of disability discrimination: (1) that on December 2, 1996, Woolley gave Gray a letter informing him that, based on Dr. Mannis' diagnosis of congenital spinal stenosis, he would no longer be able to work for Defendant as a forklift operator; (2) that on December 2, 1996, Woolley helped Gray complete an application for short-term disability benefits, in which Woolley indicated the "Nature of Disability" was "congenital spinal stenosis"; and (3) that, after Dr. Mannis released Gray to work without restrictions in December, 1996, Woolley allegedly contacted Dr. Mannis and convinced him to reimpose permanent restrictions on Gray's work activities. (Plaintiff's Memo in Opp., PP. 5-7). Upon consideration, the Court finds these incidents insufficient to amount to direct evidence that Defendant regarded Gray to be substantially limited in the major life activity of working; rather, together they demonstrate only that Defendant considered Gray to be incapable of performing the single position of forklift operator.
[15] Thus, read in conjunction with subsection (A), subsection (C) prescribes that a person is disabled under the ADA if that person is "regarded as having" a physical or mental impairment that substantially limits one or more major life activity. Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir.1995), citing 42 U.S.C. § 12102(2)(c). "The limiting adjectives `substantially' and `major' indicate that the perceived `impairment must be a significant one.'" Id. (quoting Byrne v. Board of Educ., Sch. of West Allis-West Milwaukee, 979 F.2d 560, 564 (7th Cir.1992)).
[16] The City declined to change its position despite the conclusion of a Function Capacities Examination that Conant was fully capable of performing all the essential job functions for the job of General Laborer. Conant, 271 F.3d at 784.
[17] Plaintiff makes much of the fact that the imposition of these permanent restrictions on December 9, 1996, allegedly represented a change in Dr. Mannis' opinion brought about through pressure from Defendant employer. (Plaintiff's Memo in Opp., P. 2). The Court's review of the record reveals, however, that Dr. Mannis placed almost identical restrictions on Gray's work activities in November, 1996, before Defendant Company's alleged attempt at coercion, as follows: "I do not believe he [Gray] will be able to continue the type of duties which include repetitive bending, lifting, reaching and stooping. It is apparent that the job he previously was performing will not be appropriate for him in the future and again I would suggest vocational rehabilitation if feasible." (Defendant's Att. 5, P. 39).
[18] The Court finds Plaintiff's attempt to infer Defendant's intent through the testimony of Plaintiff's own vocational expert unpersuasive.
[19] Plaintiff asserts that even if Defendant's actions were based upon earlier restrictions imposed by Dr. Mannis, Defendant still had an obligation to assess the extent to which those earlier restrictions impacted Gray's ability to perform the forklift operator job as it was actually being performed. (Plaintiff's Memo in Opp., P. 9, citing Holiday v. City of Chattanooga, 206 F.3d 637, 643 (6th Cir. 2000)). As noted above, however, Defendant presents uncontradicted evidence, in the form of both the job description for Gray's position and deposition testimony from Gray's co-worker, that confirms the essential job functions for the position of forklift operator as it was actually performed included bending and lifting, both of which were limited by Dr. Mannis' earlier restrictions. (Defendant's Att. 3; SPD, P. 20).
[20] It should be noted that Dr. Mannis' "best medical judgment," imposing the permanent restrictions, comported with the opinions of two other physicians who examined Gray during the relevant time period. Gray was examined by Dr. David Volarich in March, 1996, and by Dr. J.H. Morrow, Jr. in January, 1997. Both doctors placed permanent restrictions on Gray's bending, lifting and squatting activities, and both concluded that if Gray were to continue in his forklift operator duties at Excl, he would place himself at significant risk for re-injury and/or aggravation of the condition of his lower back. (Defendant's Atts. 4, 22).
[21] In light of the above ruling, the Court need not address Defendant's other arguments in support of its Motion for Summary Judgment. Further, upon careful review of the record and relevant case law, the Court finds that neither an award of fees and costs pursuant to 42 U.S.C. § 12205, nor the imposition of sanctions, is appropriate at this time.