**Jo Ann CROCK, Plaintiff,**

v.

**SEARS, ROEBUCK & COMPANY,
a New York Corporation, and
Scott Rhein, Defendants.**

**No. 4:01–CV–40435.**

United States District Court,
S.D. Iowa,
Central Division.

May 8, 2003.

As Corrected May 15, 2003,
Nunc Pro Tunc.

Thomas J. Jackowski, Clive, IA, for Plaintiff.

Lora L. McCollom, Jay Chung, Gonzalez Saggio & Harlan LLP, West Des Moines, IA, for Defendants.

## ORDER ON SUMMARY JUDGMENT

GRITZNER, District Judge.

Plaintiff Jo Ann Crock ("Crock") brings this employment discrimination action against Defendants Sears, Roebuck & Company ("Sears") and Scott Rhein ("Rhein") alleging violations of the Americans with Disabilities Act and the Iowa Civil Rights Act. Plaintiff further alleges Rhein and Sears retaliated against her in violation of Iowa Public Policy.

This matter comes before the Court on Defendants' Motion for Summary Judgment. A hearing on the motion was held February 25, 2003. Plaintiff Jo Ann Crock was represented by Thomas Jackowski; Defendant Sears, Roebuck & Company was represented by Lora McCullom.

## I. FACTUAL AND PROCEDURAL BACKGROUND [1]

Following the birth of her daughter in 1992, Crock began experiencing physical and cognitive difficulties including short-term memory loss, a right leg limp, and visual/spatial problems. Crock consulted several medical professionals concerning her condition.

A doctor at the University of Chicago told Crock she had damage on both sides of her brain and recommended cognitive therapy and counseling. In September, 1999, Crock obtained therapy at the University of Iowa.

In 1999, Defendant Sears launched its "Sears.com" web center. The web center processed on-line tool and gift card orders and created "Toolman", an offshoot web-site which fields on-line tool-related questions. Bill Christopher ("Christopher") developed the web center, and Mary Graft ("Graft") was project manager. Defendant Scott Rhein ("Rhein") was selected as the web center director of operations. Graft and Christopher were based at the Hoffman Estates, Illinois, office; Rhein was based at the Des Moines web center.

The web center grew rapidly, and new employees were hired; team managers were assigned to oversee the On-Line Care Associates ("OCAs"). The explosive growth required the web center to relocate across town to a larger facility. As new positions were considered, Christopher and Graft discussed the possibility of hiring Graft's friend, Jo Ann Crock, for a position on the web center team.

Crock's previous work experience was writing grant proposals, a field unrelated to web center management. Nonetheless, Graft believed Crock, who had a Bachelor of Arts degree in Sociology from St. Mary's College at Notre Dame and a Masters of Public Health Administration, was intelligent, mature, and would be an asset to the web center team. Crock was interviewed by several people, including Christopher, Graft, and Rhein. Michael Hoehne ("Hoehne"), Director of Human Resources based out of Hoffman Estates, also interviewed Crock. Christopher was impressed with Crock's enthusiasm and creativity, but Hoehne recommended against hiring Crock because she lacked experience in project management.

Despite the reservation voiced about Crock, Christopher hired her in December, 1999, creating the project coordinator position for her. Her responsibilities were to coordinate special projects focusing on the

---

1. The lengthy factual discussion is necessary due to the fact sensitive nature of employment discrimination cases, *see generally Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 n. 8 (5th Cir.1999), and the Plaintiff's general rather than specific arguments of genuine issues of material fact.

quality of the web center's e-mail system ("EMS"). Although Crock worked out of the Des Moines web center, she reported to Graft at the Hoffman Estates office. Graft told Crock she would have a "manager's desk" on the web center floor. Graft knew Crock had emotional and physical difficulties following the birth of daughter; however, Crock never mentioned any restrictions or accommodations due to those problems. When she was hired by Sears, Crock told Graft she wanted her work to speak for itself.

When Crock started at Sears.com in December, 1999, it was the first holiday season at the web center. The web center was chaotic. All managers, including Crock, worked long hours responding to on-line gift orders. Once the holiday rush ebbed, Crock's assignment was to create an e-mail data system categorizing the e-mail topics and detailing the number of e-mails received and the response time. The e-mail statistics, or "metrics", were compiled by James Holloway ("Holloway") and Sasan Sadr ("Sadr") and entered into monthly e-mail metric reports. The system of collecting metrics was new and subject to interpretation.

In February, 2000, Crock was the single point of contact ("SPOC") for the rollout of a new and more efficient e-mail management system called Octane. Crock's duty was to address the business application side of the system. The transition to the new system created pandemonium to an already overworked web center. During February and March, there were technical glitches with Octane which caused various problems. Adding to the chaos, desks on the web center floor were moved several times in response the center's continued expansion.

Crock testified that around this time she began having problems with Rhein. She suspected Rhein altered e-mail metrics to make the web center appear more effi-

cient. Crock told Graft, who allegedly told Christopher; however, Christopher does not remember the allegation. Christopher testified that in February, 2000, the metrics were not exact because of the primitive collection process at that time; in some cases, stick counts were used to keep track of the data. He states he was confident in the numbers reported to him by Holloway and Sadr and denies questioning Rhein about altering metrics.

In late March, Dan Wisnousky ("Wisnousky"), a member of the information technology ("IT") department in charge of implementing the technical aspects of Octane, expressed concern to Christopher that as the SPOC, Crock lacked the necessary understanding of Octane. Wisnousky told Christopher associates would not go to Crock for help with the business application of Octane because she did not know how to use the system. Another member of IT, Wayne Schuster, voiced similar concerns about Crock's knowledge of Octane and the reluctance of OCAs to ask her for help.

In late March and early April, more concerns were raised about Crock's lack of progress on the EMS project. Although Graft had been on medical leave since February 10, 2000, she and Christopher drove to the Des Moines web center to evaluate Crock. They asked Crock to demonstrate Octane, but she was unable to execute the basic functions of the system. Both Christopher and Graft were stunned that two months after the rollout, Crock had not mastered even the basic aspects of the system for which she was the SPOC. Both supervisors were distraught; Christopher told Graft he felt Crock should be terminated. Graft felt particularly responsible because she had recommended Crock for the position.

On April 10, 2000, Graft informally discussed the concerns she and Christopher

had with Crock; Graft told her formal action had to be taken. Crock complained that Rhein's conduct was making her work difficult. She said Rhein had embarrassed her at meetings, repeatedly moved her desk, and did not invite her to management meetings. She told Graft she was thinking of filing a formal complaint against Rhein. Graft discouraged Crock from filing a complaint and said she would speak with Christopher about Rhein's conduct. At this point, Crock told Graft for the first time that her brain injury caused short-term memory loss and suggested it might have caused her performance problems.

Christopher and Graft consulted members of the Human Resources Department to formulate a corrective discipline for Crock. Graft and Tamara Thomas ("Thomas") worked on the corrective discipline. Graft expressed that although she was extremely disappointed with Crock's performance, Crock was her friend. Graft said she would issue the discipline because it would be too humiliating to Crock if a member of Human Resources issued it. Graft also expressed Crock's complaints about Rhein and not wanting him involved.

Graft felt all five steps of Sears' progressive discipline procedure were not necessary because Crock was not performing the management functions of her job. After Hoehne and Human Resources Supervisor Sherre Gomis ("Gomis") became involved, it was determined that all five steps would be followed.[2]

On April 12, 2000, Crock received a "Corrective Discipline" which listed Crock's progress deficiencies and set forth specific deliverables or tasks which Crock was required to complete.[3] Crock strongly disagreed with the "tone" of her discipline and felt she had not been properly trained.

On April 18, 2000, Crock contacted Human Resources with questions, including concerns about the deliverables set forth in her corrective discipline. Thomas met with Crock to discuss those issues. Crock brought Thomas into a conference room and showed her a Sears "Harassment and Discrimination in the Workplace" pamphlet. Crock complained that Rhein had been creating an uncomfortable environment for about six weeks. Crock felt her corrective discipline was issued in retaliation for complaining about Rhein. Crock said Rhein never pinched or touched her but he "fostered an environment allowing the unfair treatment of women." When Thomas told Crock she never received a formal complaint, Crock told Thomas "this is as formal as it gets." Thomas requested names and examples of harassment so it could be investigated, but Crock said she had "already named names and would in the future", but would not then provide the information. Thomas told Crock she took the complaint seriously and would talk to her supervisor, Gomis. Crock did not want Gomis involved because Gomis was Rhein's friend and Crock believed she told Rhein about her confidential corrective

---

**2.** The steps are (1) an informal one-on-one; (2) memo to file; (3) corrective review; (4) final notice; and (5) request to terminate. Step one is informal; only the employee and team manager need to be involved. Steps two through five require the involvement of the team manager, department manager, and human resource manager.

**3.** The deliverables assigned on April 12, 2000, required Crock to list the actions she had taken to improve the web center by April 13, 2000. By April 21, 2000, Crock had four tasks to complete: (1) produce previously requested organized binders; (2) demonstrate her ability to process appliance orders; (3) demonstrate her ability to process tool orders; and (4) demonstrate her ability to navigate Octane.

discipline. Crock asked if Hoehne could be involved instead.

Also on April 18, 2000, Crock called Sears' Ethics Line. Referring to the harassment pamphlet, she said she wanted to file a complaint. Crock did not identify herself at that time but stated that she had a harassment case and would call back when she could speak more freely. During that call, Crock was given a case number and informed that she needed to provide her name in order for the claim to be investigated.

On April 19, 2000, Thomas met again with Crock to investigate her harassment allegation. Thomas told Crock that Gomis had to be involved because the complaint came out of the web center and it was Gomis' jurisdiction. Crock disagreed with this and felt since Hoehne was her original contact, he should be the one to investigate the complaint. Crock believed Gomis would not treat her fairly, as evidenced by the harsh words Gomis added to Crock's corrective discipline.[4] Crock reiterated that Gomis had a conflict of interest since she was a friend of Scott Rhein, the perpetrator. Crock informed Thomas that she called the Ethics Line and now people would be nice to her to "cover their butts."

Thomas asked for details so the harassment claim could be investigated. Crock said there were thirty (30) to forty-five (45) incidents; she said it was more than a one-time event; it was a "pattern of harassment" since January. Crock used the term "hostile environment" several times throughout the conversation. However, Crock only gave the following three examples of Rhein's alleged harassment:

1. Crock had conflicting meetings, so she chose the meeting she felt was more important and missed the other meeting. Rhein e-mailed the meeting notes to Christopher, stating, "since Jo Ann failed to attend the meeting, here are the notes." Crock felt this was humiliating.

2. During a managers' meeting, Rhein asked for volunteers to write an OCA job description. Frank Wilson volunteered. Crock told Wilson since she was on the OCA Advisory Council, she should help. Wilson allegedly responded by yelling at Crock that his own people would work on the project. Other managers allegedly cheered for Wilson. Crock felt by allowing this, Rhein fostered a hostile environment.

3. Crock said her paycheck had been incorrect since she started working. Although she initially thought it was just an administrative mistake, she was not sure any more. Crock also felt someone had tampered with her e-mail.

Thomas told Crock she would discuss both the deliverables and harassment issues with Hoehne and Gomis. Crock then told Thomas it took her longer to learn because of a head injury. When Thomas followed up on Crock's pay issues with Julie Schroeder ("Schroeder"), Schroeder told Thomas she remembered that Crock mentioned an impairment but that Crock said she did not need accommodation and did not want anyone else to know.

On April 20, 2000, Crock called the Ethics Line again. She said she had a brochure and felt her situation would be classified as a hostile working environment case. She also said she wanted the word "retaliation" in her case. Crock was concerned her case would be referred back to Des Moines where Gomis would handle it. Crock offered her belief that Gomis was biased and said she did not want to speak

---

4. Rather than bypass the five-step process, Gomis added the language "if critical performance issue arises prior to the next review, the disciplinary process could be escalated."

to anyone except a manager. The caseworker referred the complaint to Pam Fowler ("Fowler").

Fowler spoke with Crock on April 25, 2000. Crock told Fowler that Rhein was retaliating against her because of problems with the rollout of the EMS. Crock said Rhein was setting her up for failure, had moved her desk numerous times, and withheld information which was necessary for her to do her job. Crock told Fowler about her corrective discipline and deliverables, stating how unreasonable they were. Crock also discussed her visual/spatial impairment and told her she needed a specific desk but Rhein kept moving and changing her desk. Crock complained that Hoehne and Thomas had not addressed the problems. Crock stated that she was afraid her call to the Ethics Line had been reported. Fowler assured her that it had not been but that Hoehne would have to be contacted.

On May 1, 2000, Fowler placed several calls investigating Crock's complaint. Mike McMahon ("McMahon"), who handles ADA issues, was contacted to resolve Crock's desk complaint. McMahon contacted Hoehne, who responded the same day indicating the desk problem was being resolved. Hoehne told McMahon that Crock never before requested or stated that she need a specific desk. Fowler also verified that Crock had not previously told her supervisors she had a disability or that she needed a special desk.[5] Hoehne testified that he spoke with Rhein about Crock's desk, and Rhein denied Crock ever mentioned that she needed a special desk. By May 10, 2000, Crock received a desk meeting her specifications.

In early May, Christopher, Graft, and Thomas met with Crock about her progress on the deliverables. Christopher expressed his concern that Crock had not yet grasped Octane, and there were five more implementations coming up. Christopher agreed with Crock that there were technical problems with the system, but he viewed that as no excuse for Crock's failure to learn the business process. He believed Crock did not prioritize her assignments and got bound up with unimportant or unassigned matters. Christopher observed that Crock was task oriented rather than project management driven. He asked Crock where she felt she could contribute. Crock felt she could not meet Christopher's expectations and should be on the Des Moines team with James Holloway as her supervisor.

Christopher also asked Crock why she had not brought her complaints about Rhein to him before she reported them to the Ethics Line. Crock said Rhein was hostile to her because she reported to Christopher and Graft at Hoffman Estates rather than to the Des Moines web center team. Christopher asked for specific ways Rhein fostered hostility. Crock responded that Rhein had her desk moved several times without warning, he failed to invite her to management meetings, and he publically humiliated her, making her job harder.

Christopher pointed out that every desk on the web center floor had been moved due to the rapid growth of the web center. As for being excluded from some management meetings, Christopher said some of those meetings were for Rhein's own team and did not involve Crock. Thomas opined that the tense environment might be due to the fast pace of the web center and perhaps Crock was taking things negatively which were not intended that way.

---

**5.** Crock admits in her deposition that she never told anyone she needed a special desk. She argues that because she was promised the "manager's" desk, she did not need to mention it. All desks are modular units; associates share a double unit, while managers generally have their own double module.

Crock respectfully disagreed. Christopher made the decision to take Crock off the EMS project and reassigned her to the Des Moines team with James Holloway as her new manager. Crock's salary and benefits stayed the same.

Crock met with Holloway and discussed her needs. Crock told Holloway about her partial blindness and that she became fatigued as the week went on. Crock also asked if Holloway could check on her eligibility for vacation. Holloway explained that they needed to focus on Crock's business results. He scheduled Crock for the "new hire" training course and arranged a weekly meeting time so he could monitor Crock's progress. During the next couple months, Crock took time off and made several requests of Holloway to alter her work schedule. She asked Holloway if she could work out of her home, which he denied. She also asked if he could change her schedule, allowing her to come in later in the morning because she said she would perform better.

In early June, Crock spoke with Fowler (Ethics Line) complaining that her issues had not been investigated and that Rhein's harassment continued. Crock said Rhein was harassing her by holding her to deadlines and threatening her. When Fowler asked how Rhein threatened her, Crock said he told her he would "hold her feet to the fire" on the deadlines. Crock felt she was not being given the same amount of time to get her work done as other managers, and the deadlines were unreasonable. Crock told Fowler she read all the harassment brochures and watched all the videos and felt Rhein was creating a hostile work environment.

On June 7, 2000, Hoehne and Fowler discussed Crock's harassment complaint.

Hoehne wanted it relayed to Crock that she was in a business environment and many people who were compensated a lot less had greater demands than she did; short notice and expectations were part of a highly competitive industry. Hoehne and Fowler determined a third-party investigator from the Associate Relations Department should intervene. Fowler called Crock and told her how the investigation would move forward. Crock told Fowler she felt she needed a vacation.

In July, Graft submitted Crock's mid-year performance review. Graft stated that while Crock was under her supervision she failed to meet expectations, lacked organization, and was unable to prioritize. Although Crock had a talent for written communications, she had been hired to contribute on a much broader basis and was not meeting those expectations. Graft felt Crock had not focused on learning the business process and she overemphasized unimportant matters which caused her colleagues to lose respect for her.

On August 8, 2000, Crock called the Ethics Line and said she was going to have to go on medical leave because of the harassment. The record shows that Crock's allegations of harassment had been investigated but had not been substantiated.

Crock was placed on medical leave on August 10, 2000. During her leave of absence, Crock wrote a letter to Sears requesting a transfer to a Sears retail location. Upon considering this request, several individuals reviewed Crock's file and found that, since her April corrective discipline, Crock continually failed to meet expectations; another corrective discipline was issued.[6]

6. To be eligible for a transfer, Sears' policy requires an employee to be (1) in the current position for twelve months; (2) meeting expectations at the annual review; and (3) discipline free within thirty days of the request. Crock's performance was reviewed, and she

On September 20, 2000, Thomas spoke with Crock and told her a transfer was not an option. Crock informed Thomas she was unable and unwilling to return to work under the circumstances. Crock's doctor released her to return to work on September 22, 2000; however, by September 28, 2000, Crock had not returned. Sears sent Crock a letter informing her she had been terminated for failing to return after being medically released.

Crock filed complaints with the Iowa Civil Rights Commission ("ICRC") and the Equal Employment Opportunity Commission ("EEOC") arguing she was discharged because she reported Rhein's criminal misconduct. Crock received administrative release (right-to-sue) letters from those agencies on May 9, 2001, and May 14, 2001, respectively. Crock filed this complaint on July 18, 2001, which was within ninety (90) days of receiving her right-to-sue letters. Crock alleges as a result of the harassment, she suffered emotional distress, exhaustion, and anxiety, triggering acute asthma and further complicating the symptoms of her brain injury.

Crock asserts she suffers from two disabilities, acquired brain injury and acute asthma. She further asserts Sears was aware of both disabilities. In Counts I and II, Crock charges Sears with violations of the ADA and ICRA for not reasonably accommodating her disabilities. In Count III, Crock charges that Sears and Rhein retaliated against her in violation of Iowa Public Policy.[7]

Sears filed this Motion for Summary Judgment on December 2, 2002, arguing Sears is entitled to judgment as a matter of law because (1) Plaintiff does not suffer from any disability which substantially limits any of her major life activities and, therefore, cannot prove a prima facie case of discrimination under the ADA; (2) Sears did not subject Crock to any adverse employment actions as a result of her alleged disability; (3) Sears took disciplinary action against Crock for nondiscriminatory reasons which do not constitute pretext; and (4) Sears has not retaliated against Crock in any manner. Crock resists the motion, averring Sears is not entitled to summary judgment because there are genuine issues of material fact.

## II. STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) states "the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

"To preclude the entry of summary judgment, the nonmovant must make a

was placed on performance discipline on September 20, 2000, due to poor performance reviews prior to her leave of absence.

7. The briefs for both parties indicate informal discussions in which it had been agreed Plaintiff wishes to dismiss Counts IV and V, which allege Rhein committed tortious interference with employment relationship and outrageous conduct. On that representation, the Court will dismiss those Counts.

sufficient showing on every essential element of its case on which it has the burden of proof at trial." *Cont'l Grain Co. v. Frank Seitzinger Storage,* 837 F.2d 836, 838 (8th Cir.1988). Rule 56(e) requires "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)).

The court's function on a motion for summary judgment is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Niagara of Wis. Paper Corp. v. Paper Indus. Union–Mgmt. Pension Fund,* 800 F.2d 742, 746 (8th Cir.1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "'On summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Econ. Housing Co. v. Cont'l Forest Prods., Inc.,* 757 F.2d 200, 203 (8th Cir.1985).

"[S]ummary judgment should seldom be granted in discrimination cases." *Bassett v. City of Minneapolis,* 211 F.3d 1097, 1099 (8th Cir.2000). "Summary judgements should be sparingly used and then only in those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson v. Minn. Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991) (citing *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 365 (8th Cir. 1987)). However, in discrimination cases, the plaintiff is not entitled to survive summary judgment merely by establishing a prima facie case. *Reich v. Hoy Shoe Co., Inc.,* 32 F.3d 361, 365 (8th Cir.1994) (citing *Hebert v. Mohawk Rubber Co.,* 872 F.2d 1104, 1111 (1st Cir.1989)). The "plaintiff's evidence must be sufficient to raise a genuine issue of material fact regarding defendant's reason for the employment action taken." *Reich,* 32 F.3d at 365; *see also Berg v. Norand Corp.,* 169 F.3d 1140, 1144 (8th Cir.1999) ("[T]here is no 'discrimination case exception' to the application of Fed.R.Civ.P. 56, and it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial.").

### III. DISCUSSION

■ Crock alleges Sears discriminated against her in violation of the ADA and the ICRA.[8] The ADA "prohibits employers from discriminating against qualified individuals with a disability on the basis of such disability." *EEOC v. Exel, Inc.,* 208 F.Supp.2d 1013, 1021 (E.D.Mo.2002) (citing 42 U.S.C. § 12101).

### A. Establishing a Claim of Employment Discrimination Under Title VII

■ A plaintiff can prove employment discrimination under the ADA by either

---

8. The ICRA was modeled after Title VII, and Iowa courts traditionally turn to federal law for guidance in evaluating the ICRA. *Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) (citing *King v. Iowa Civil Rights Comm'n,* 334 N.W.2d 598, 601 (Iowa 1983)). Therefore, the ADA analysis applies to Crock's ADA and ICRC claims.

the *Price Waterhouse* test or the *McDonnell Douglas* test. The *Price Waterhouse* or "mixed motives" test which satisfies a plaintiff's burden by producing direct evidence the plaintiff's disability played a motivating part in the adverse employment decision. *Yates v. Rexton,* 267 F.3d 793, 798 (8th Cir.2001) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). Once direct evidence has been established, the burden shifts to the defendant to demonstrate by a preponderance of the evidence that the same employment decision would have been reached absent any discrimination. *Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. 1775. "If the employer fails to meet this standard, the employee prevails." *Cronquist v. City of Minneapolis,* 237 F.3d 920, 924 (8th Cir.2001).

"When there is no direct evidence of discrimination, discrimination claims are analyzed under the burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Pickens v. Soo Line R.R. Co.,* 264 F.3d 773, 777 (8th Cir.2001). Under the *McDonnell Douglas* framework, the plaintiff "must establish a prima facie case of discrimination before the burden of production shifts to the employer to produce evidence of a legitimate, non-discriminatory reason." *Yates,* 267 F.3d at 799. If the employer presents a nondiscriminatory reason, "[t]he burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for discrimination." *Id.* However, the ultimate burden remains with the plaintiff at all times. *Tex. Dep't of Cmty, Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

### 1. Direct Evidence *Price Waterhouse* Test

 Under the *Price Waterhouse* analysis, a plaintiff can establish an unlaw-

ful employment practice by demonstrating "an illegitimate criterion was a motivating factor in an adverse employment action, even though other factors also motivated the action." *Browning v. President Riverboat Casino–Mo.,* 139 F.3d 631, 634 (8th Cir.1998). " 'Direct evidence' has been interpreted as 'conduct or statements . by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to find that attitude was more likely than not a motivating factor in the employer's decision.' " *Id.* (quoting *Deneen v. Northwest Airlines Inc.,* 132 F.3d 431, 435–36 (8th Cir.1998)); *see also Kells v. Sinclair Buick–GMC Truck, Inc.,* 210 F.3d 827, 835 (8th Cir.2000) ("Direct evidence is that which demonstrates a specific link between the challenged employment action and the alleged animus"). However, " 'direct evidence' does not include 'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.' " *Browning,* 139 F.3d at 635 (quoting *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775).

 In resistance to summary judgment, Crock argues direct evidence is shown because (1) Graft knew of Crock's disability before she hired her; (2) Graft promised Crock accommodation then intentionally refused to provide it; and (3) once Graft became aware of the impact Crock's disability had on her job performance, she wanted her terminated. However, these arguments are contrary to the record evidence.

Graft testified that although she knew Crock had problems related to childbirth, Crock never referred to those problems as a disability. Crock also testified that she asked Graft not to mention any of her problems because she wanted her work to

speak for itself. This record reflects the first time Crock referred to a disability was after her corrective discipline in April, 2000.

Graft's promise of a desk was not a promise of accommodation. Crock testified that Graft promised her a desk "like other managers got". This promise cannot be construed as a promise of "accommodation for a disability".

Crock next argues Graft made comments and statements which demonstrate disability-based animus. Graft told Thomas she was disappointed with Crock's performance, that Crock was not the right fit for the job, and that the five-step discipline could be accelerated because Crock was a manager. None of these statements demonstrate *disability-based* animus.

Furthermore, the record indicates Sears followed the five-step procedure and did not accelerate the discipline as Graft suggested. Subsequent to her discipline, it was *Crock* who suggested a connection between her impairments and her job performance. Graft's conduct and statements do not support a finding of direct evidence of disability-based animus.

Crock further argues direct evidence exists because Rhein intentionally discriminated against her on the basis of her disability. She alleges it was with "full knowledge that she was disabled and required accommodations to be able to fulfill her duties and responsibilities, he intentionally and systematically altered her working conditions so that she was not able to do her job." (Pl.'s Resist. at 7.) Crock argues moving her desk numerous times and commenting "not to get too comfortable in her desk" was direct evidence of Rhein's disability-based animus.

The record shows that, due to the rapid growth of the web center, many desks on the web center floor were moved, not only Crock's desk. Rhein's alleged comment, "do not get too comfortable", may be subject to both hostile and benign interpretation but, at most, represents a stray comment in the workplace and does not constitute direct evidence. *Browning,* 139 F.3d at 635. Even if the Court considers Rhein a decision maker, the comment was unrelated to any adverse employment decision and, therefore, would not constitute direct evidence. *Id.* (" '[D]irect evidence' does not include 'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself' ") (quoting *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775).

Crock's final argument that she has presented direct evidence of disability-based animus is that Hoehne and Christopher disregarded her request for accommodation. Crock also argues that failure to investigate her complaints about Rhein constitutes disability-based animus. She urges the Court to infer that because Sears found Rhein was "just doing his job", Sears found Crock, *as a disabled person,* was not doing her job. This general posturing is an equally unpersuasive argument of direct evidence of disability-based animus.

First, Crock had previously denied needing accommodation. She cannot deny needing accommodation and simultaneously accuse Sears of not providing one. *See Beck v. Univ. of Wis. Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir.1996) ("An employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations—a duty dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate"). In fact, within days of her much later report that she needed a double desk due to an impairment, Crock received the desk.

Second, Crock's conclusion that Sears found Rhein was just doing his job demonstrates Sears *did* look into her complaints. The Ethics Line log details Crock's complaints, the action taken, and the conclusion that the complaints were unsubstantiated.

Crock has not put forth any evidence "which demonstrates a specific link between the challenged employment action and the alleged animus." *Kells,* 210 F.3d at 835. Therefore, Crock cannot meet her burden of showing an unlawful employment practice under the *Price Waterhouse* analysis.

### 2. Burden–Shifting Standard of *McDonnell Douglas*

In the absence of direct evidence, a plaintiff may proceed under the burden-shifting standard set forth in *McDonnell Douglas.* Under this three-step approach, a plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence; once established, "a rebuttable presumption shifts the burden to the employer to articulate a legitimate, nondiscriminatory reason for discharging the employee." *Baker v. John Morrell & Co.,* 220 F.Supp.2d 1000, 1008 (N.D.Iowa 2002) (citing *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817).

■ To establish a prima facie case of discrimination under the ADA, Crock must prove that (1) she is a disabled person within the meaning of the ADA; (2) she was qualified for the essential functions of her job, with or without accommodation; and (3) she suffered adverse employment action because of her disability. *Cooper v. Olin Corp., Winchester Div.,* 246 F.3d 1083, 1087 (8th Cir.2001) (citing *Kiel v. Select Artificials Inc.,* 169 F.3d 1131, 1135 (8th Cir.1999) (en banc)); *Brown v. Farmland Foods, Inc.,* 178 F.Supp.2d 961, 971 (N.D.Iowa 2001). Summary judgment is appropriate if a plaintiff fails to establish

any element of a prima facie case. *Kellogg v. Union Pac. R.R. Co.,* 233 F.3d 1083, 1086 (8th Cir.2000).

If Crock establishes a prima facie case, the burden shifts to Sears "to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089.

If Sears meets this burden, the presumption and burden disappear. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The ultimate burden of persuading the trier of fact that Sears intentionally discriminated against her remains with Crock at all times. *Id.* at 507, 113 S.Ct. 2742. Therefore, once Sears produces sufficient evidence to support a nondiscriminatory explanation for its decision, Crock must demonstrate that Sears' proffered explanation is pretextual and unworthy of credence. *Id.* at 510 n. 8, 113 S.Ct. 2742 (citing *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. 1089); *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Dammen v. UniMed Med. Ctr.* 236 F.3d 978, 980 (8th Cir.2001).

#### (a) Disabled Within the Meaning of the ADA

■ As an essential initial step, Crock must prove she suffers from a disability within the meaning of the ADA. 42 U.S.C. § 12102(2) (2000). The statute defines a disability as "(a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment." *Id.* "An 'impairment' is any physiological disorder, cosmetic disfigurement, or anatomical loss affecting one of the body's systems, or any mental disorder." *Weber v. Strippit, Inc.,*

186 F.3d 907, 915 (8th Cir.1999) (citing 29 C.F.R. § 1630.2(h)). This analysis hinges on whether Crock's impairments substantially limit one or more major life activities. *Toyota Motor Mfg. Ky. Inc. v. Williams*, 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) ("Merely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity."). A case-by-case analysis is required since an impairment which disables some individuals may not disable others. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). For purposes of summary judgment, Sears concedes Crock's acquired brain injury constitutes a physical or mental impairment but argues that her impairment does not substantially limit a major life activity and, therefore, does not constitute a disability under the ADA.

**(b) An Impairment that Substantially Limits a Major Life Activity**

■ The ADA does not delineate a "major life activity" nor does it define the term "substantially limits"; however, the EEOC guidelines provide direction. "Major life activities include 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 598 (8th Cir.1998) (quoting 29 C.F.R. § 1630.2(I)). "An impairment is 'substantially limiting' if it renders an individual unable to perform a major life activity that the average person in the general population can perform, or if it significantly restricts the condition, manner, or duration under which an individual can perform a particular major life activity as compared

to an average person in the general population." *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 948–49 (8th Cir.1999). In determining whether an individual is substantially limited in a major life activity, the court will consider "(1) the nature and severity of the impairment; (2) its duration or anticipated duration; and (3) its long-term impact." *Id.* at 949 (citing 29 C.F.R. 1630.2(j)(a)(i)(ii)).

■ In resistance to Sears' motion, Crock makes several assertions about her impairment. First, Crock offers a summary of the treatment and recommendations regarding her condition. Nonetheless, assuming all Crock's assertions are true, medical diagnosis alone is not enough to prove disability status. *Toyota*, 534 U.S. at 198, 122 S.Ct. 681 ("It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment.").[9]

■ Next, Crock lists the manifestations of her impairment: limping, foot dragging, and "other" memory and cognitive function problems. Crock states some of these symptoms are constant while the severe symptoms are episodic. However, even severe symptoms which are episodic do not constitute a substantial limitation on a major life activity. *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 353 (4th Cir.2001) (finding a plaintiff who suffered weekly epileptic seizures which caused shaking, kicking, salivating, and, on at least one occasion, bedwetting, did not constitute a substantial limitation on a major life activity because holding "that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the

---

9. In her deposition, Crock discusses conversations and visits she had with graduate students, physicians, and therapists; however, she has not contributed to this record with affidavits, medical records, or deposition testimony of those individuals.

ADA beyond all bounds"). Crock's assertions that her conditions significantly restrict her in performing major life activities such as seeing, walking, breathing, learning, and working fall significantly short of the standard.

Crock suffers from foot dragging, limping, and short-term memory loss; however, none of these impairments substantially limit any major life activity. *See, e.g., Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir.1997) (finding plaintiff's limp, which caused an inability to walk briskly and trouble climbing stairs, did not substantially limit the major life activity of walking); *Kelly v. Drexel Univ.*, 94 F.3d 102, 108 (3d Cir.1996) (finding a noticeable limp caused by a hip fracture did not constitute a disability under the ADA because it caused only moderate restrictions on plaintiff's ability to walk); *Penchishen v. Stroh Brewery Co.*, 932 F.Supp. 671, 674 (E.D.Pa.1996), *aff'd*, 116 F.3d 469 (3rd Cir. 1997) (finding plaintiff who walks slower than the average person is not substantially limited in the major life activity of walking); *Felten v. Eyemart Express, Inc.*, 241 F.Supp.2d 935, 942 (E.D.Wis.2003) (finding problems associated with Attention Deficit Disorder (ADD) including disorganization, forgetfulness, periodic stumbling, communications, impulsiveness, multi-tasking, and poor memory did not constitute a substantial limitation on a major life activity).

■■■ Crock also states she suffers from limited peripheral vision as a result of her brain injury.[10] She explains that due to this impairment, when she is seated at a desk, she has difficulty if there is an obstruction on her left side. However, Crock denies having restrictions, difficulties, or

special requirements when driving a car. By way of example, Crock states her visual impairment causes her to bump into things; and, one time, while gardening, she poked herself in the eye. The Court does not question the discomfort, frustration, and inconvenience caused by Crock's impairment; however, taken in the light most favorable to Crock, these impairments do not substantially limit a major life activity. *See, e.g., Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (holding that plaintiff with monocular vision had not shown disability, and was not assumed to be disabled, within the meaning of the ADA but was required, "like others claiming the Act's protection, to prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial"); *Rivera v. Apple Indus. Corp.*, 148 F.Supp.2d 202, 213 (E.D.N.Y.2001) (reasoning that although diabetes, lack of vision in one eye, and poor vision in the other eye, constitute impairments, without establishing those impairments substantially limit a major life activity, they do not constitute disabilities under the ADA); *Beaver v. Delta Air Lines, Inc.*, 43 F.Supp.2d 685, 692 (N.D.Tex.1999) (finding an employee who suffered from a partial blind spot was not disabled within the meaning of the ADA because "[e]ye problems or dysfunctions that do not limit normal daily activities do not constitute substantial limitations under the ADA").

■■■ Finally, Crock argues, "it is clear from the evidence that while employed at Sears her medical condition *impacted* her

---

10. Crock also states she suffers from asthma but does not explain how or if her asthma substantially limits a major life activity. Crock's deposition indicates her bouts with asthma have been episodic since childhood. During her employment at Sears, Crock states she had only one episode which occurred when she was exposed to paint thinner at a friend's home. As stated above, episodic impairments do not qualify as a disability under the ADA. *See Sara Lee Corp.*, 237 F.3d at 353.

ability to see, walk, breathe, learn, and work." (Pl.'s Resist. at 11.) This mere assertion is not enough to survive a motion for summary judgment even in an employment discrimination case. *Berg,* 169 F.3d at 1144 ("[T]here is no 'discrimination case exception' to the application of Fed. R.Civ.P. 56, and it remains a useful pre-trial tool to determine whether or not any case, including one alleging discrimination, merits a trial."). Moreover, a negative impact is not enough to allow an inference of a substantial limitation. *Cooper,* 246 F.3d at 1088–89 (concluding a plaintiff who describes her impairment (depression) as causing a negative impact is not enough to allow an inference of a substantial limitation).

 In the absence of a plaintiff showing a substantial limitation on a major life activity, the court may look at a substantial limitation on the plaintiff's ability to work. *Cooper,* 246 F.3d at 1089. However, "[t]o be regarded as substantially limited in the life activity of working, a plaintiff must be regarded as 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" *Id.* (quoting *Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 523, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999)).

Crock has not produced any evidence indicating she is unable to perform a class of jobs that could be performed by a person having comparable training. In fact, the evidence indicates that, after the onset of her symptoms, Crock has performed several types of work. She worked for a temporary employment agency (Manpower) in Seattle. She left that job to be with her mother, who was dying of cancer in Iowa. Following her mother's death, Crock worked eight to twelve hour shifts providing hospice care. Before taking the job at

Sears, Crock wrote a grant for her daughter's elementary school. Therefore, there is no support for Crock's allegation that she is substantially limited in the major life activity of working.

Crock has not presented any evidence that, due to her impairments, she was "unable to perform a major life activity that the average person in the general population can perform." *Fjellestad,* 188 F.3d at 948–49; *Rogers v. Int'l Marine Terminals, Inc.,* 87 F.3d 755, 758 (5th Cir.1996) (finding that "[u]nder the ADA, not all limitations are substantial").

### (c) Record of an Impairment

 A plaintiff can alternatively show that she is disabled within the meaning of the ADA if she has a record of such an impairment. "In order to have a record of disability under the ADA, a plaintiff's medical documentation must show that [she] has a history of, or has been misclassified as having, a physical or mental impairment that substantially limits one or more major life activities." *Weber,* 186 F.3d at 915 (citing 29 C.F.R. § 1630.2(k)); *Taylor v. Nimock's Oil Co.,* 214 F.3d 957, 961 (8th Cir.2000). The record which indicates Plaintiff has or had a substantially limiting impairment must be one relied upon by the employer in making the employment decision. 29 C.F.R. § 1630.2(k). Submission of a medical diagnosis of an impairment is insufficient proof of a record of disability. *Albertson's,* 527 U.S. at 567, 119 S.Ct. 2162 (citing *Sutton,* 527 U.S. at 483, 119 S.Ct. 2139).

Crock argues that Graft's knowledge of her disability constitutes a record of having an impairment. Graft testified that she knew Crock had difficulty giving birth to her daughter and knew she was under stress as a single mother but argues Crock never referred to her problems as a disability until after her corrective discipline in April 2000. She also testified that

Crock told Graft not mention these problems because she wanted her work to speak for itself.

The potential clash between the testimony of Crock and Graft on this issue is not material. It does not matter whether Graft knew Crock had an impairment or not because mere knowledge of a physical or mental impairment is not enough to show that Crock has a history of a disability nor does it create a *record* of an impairment. *Taylor*, 214 F.3d at 961. Crock never provided Sears with any documentation of her impairment as required by the Eighth Circuit. *Id.; Weber*, 186 F.3d at 915.

Crock further argues a record is established because, while filling out payroll forms, she told Schroeder in Human Resources that she had a disability. However, Crock also admits that she told Schroeder she did not require accommodation. Crock never presented Schroeder with documentation of an impairment. Again, mere knowledge of an impairment does not create a record of an impairment. *Taylor*, 214 F.3d at 961.

■■■ Crock further asserts Hoehne and Holloway knew of her disability because they provided her the desk she requested. An employer's response to a request for accommodation does not create a "record" of an impairment. *See id.* (sending "a getwell card and a note about her job duties" to a hospitalized employee did not constitute sufficient documentation that the employee had a history of disability).

Crock fails to show Sears had any documentation showing she had a record of an impairment under the ADA. This record fails to provide the necessary record of impairment.

### (d) Perceived or Regarded as Being Disabled

The final way Crock could demonstrate she falls under the class of persons defined as disabled under the ADA is by demonstrating Sears "regarded" her as having a disability. 42 U.S.C. § 12102(2)(C).

There are three different ways in which an individual may satisfy the definition of 'being regarded as having a disability':

(1) The individual may have an impairment which is not substantially limiting but is perceived by the employer or other covered entity as constituting a substantially limiting impairment;

(2) The individual may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment; or

(3) The individual may have no impairment at all but is regarded by the employer or other covered entity as having a substantially limiting impairment.

. . . . .

Therefore, if an individual can show that an employer or other covered entity made an employment decision because of a perception of disability based on 'myth, fear or stereotype,' the individual will satisfy the 'regarded as' part of the definition of disability. If the employer cannot articulate a non-discriminatory reason for the employment action, an inference that the employer is acting on the basis of 'myth, fear or stereotype' can be drawn.

29 C.F.R. pt. 1630, App. § 1630.2(1). *See also Sutton*, 527 U.S. at 489, 119 S.Ct. 2139 (" 'Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from impairment.' ") (quoting *Sch. Bd. of Nassau County v. Arline*, 480 U.S. 273, 284, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)).

As proof Sears regarded her as disabled, Crock states "[t]here is ample evidence, taken in the light most favorable to the Plaintiff, which shows that numerous Sears' employees perceived or regarded Crock as being substantially limited in major life activities." (Pl.'s Resist. at 13.) Here again, this bare allegation, without articulating *which* evidence in the record supports the conclusion, does not satisfy Crock's burden. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (requiring a plaintiff to "designate '*specific* facts showing that there is a genuine issue for trial'") (quoting Fed.R.Civ.P. 56(c)) (emphasis added). Contrary to Crock's assertion, there is ample evidence that Sears regarded Crock as quite *able.* Graft recommended Crock because she considered her highly educated and professional. Christopher was impressed with Crock's enthusiasm and drive and hired her into a management position in a burgeoning web center despite her lack of management experience. Throughout her employment, the record reflects that Crock was routinely expected to function under the pressures of a rapidly expanding and demanding business. The record provides no basis upon which to conclude the criticism of Crock's work effort evidenced she was regarded as suffering from a disability. These accounts do not demonstrate that Sears perceived Crock as disabled, nor do they reflect myth, fear, or stereotype that Crock had an impairment which substantially limited a major life function.

For the foregoing reasons, the Court finds Crock has not shown she suffers from an actual or perceived disability under the ADA or the ICRA. Because Crock has not established the first element of a prima facie case of disability discrimination, she cannot maintain a claim under either statute; therefore, summary judgment is appropriate. *Kellogg*, 233 F.3d at 1086.

## B. Retaliation Claim

Crock's final claim is that Rhein and Sears subjected her to adverse employment actions, a hostile working environment, harassment, and retaliation, in violation of Iowa Public Policy.[11] "The ADA contains an anti-retaliation provision that prohibits discrimination against an individual because that individual 'opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing' conducted pursuant to the statute." *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1025 (8th Cir.1999) (citing 42 U.S.C. § 12203(a)). The Eighth Circuit "evaluates ADA retaliation claims under the burden-shifting framework announced in *McDonnell Douglas*". *Id.*

Under this framework, Crock bears the burden of establishing a prima facie case of retaliation. *Id.* "In order to establish a prima facie case of retaliation, a plaintiff must show (1) that [she] engaged in a statutorily protected activity, (2) that an adverse action was taken against [her], and (3) a causal connection between the adverse action and the protected activity." *Id.* "A person cannot show that [she] engaged in a statutorily protected activity without first demonstrating that [she] had a good faith reasonable belief that the alleged retaliator was engaging in discriminatory activity." *Id.* "[O]nce a plaintiff

---

**11.** Count III of Crock's complaint is styled as a common law retaliation claim but argued as a retaliation claim under the ADA. Iowa uses the same burden-shifting analysis as the ADA. *See Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 299 (Iowa 1998) (maintaining a retaliation claim, "a plaintiff must establish (1) engagement in a protected activity, (2) adverse employment action, and (3) a causal connection between the two").

establishes a prima facie case of improper retaliation, the burden then shifts to the defendant to proffer a legitimate nondiscriminatory reason for the adverse action." *Id.* at 1025–26 (citing *Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

### 1. Statutorily Protected Activity

Crock must first show she was engaged in a statutorily protected activity. In her complaint, Crock alleges the statutorily protected activity was reporting Rhein's criminal conduct of manipulating e-mail metrics and contacting the EEOC. However, in resistance to the motion for summary judgment, Crock alleges she was engaged in the statutorily protected activity of "complaining to anyone who would listen that she was disabled and required reasonable accommodation and that she likewise was the victim of a hostile work environment." (Pl.'s Resist. at 18.) Crock asserts that once she began complaining, Sears began retaliating against her; and, therefore, there is a causal connection between the protected activity and the adverse employment action.

To present a showing of retaliatory discrimination, "[a] plaintiff need not establish the conduct which she opposed was in fact discriminatory but rather must demonstrate a good faith, reasonable belief that the underlying challenged conduct violated the law." *Buettner v. Arch Coal Sales Co., Inc.,* 216 F.3d 707, 714 (8th Cir.2000). However, the report must be of conduct believed to violate the ADA. *See* 42 U.S.C. § 12203 (2000) ("No person shall discriminate against any individual because such individual has *opposed any act or practice made unlawful by this chapter* or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.") (emphasis added).

Because Crock must have been in an activity protected under the ADA, Crock's argument that reporting Rhein for manipulating e-mail metrics clearly fails. Crock offers no legal authority that reporting manipulation of production statistics violates the Americans with Disabilities Act; therefore, this is not a protected activity.

However, Crock's other complaints, (1) that she was disabled and needed accommodation, (2) that she contacted the EEOC, and (3) the allegation that Rhein created a hostile working environment, do constitute protected activities. Therefore, the first element of this burden-shifting analysis is satisfied. Crock must now establish she suffered an adverse employment action.

### 2. Adverse Employment Action and Causal Connection

"Proof of an adverse employment action requires a 'tangible change in duties or working conditions that constitute[ ] a material employment disadvantage.'" *Cossette v. Minn. Power & Light,* 188 F.3d 964, 972 (8th Cir.1999) (quoting *Manning v. Metro. Life Ins. Co.,* 127 F.3d 686, 692 (8th Cir.1997)).

Crock's allegation that the adverse action occurred *after* she began complaining is not supported by evidence in the record. Crock's first corrective discipline was issued on April 12, 2000, but Crock's complaint to Human Resources was made on April 18, 2000, and her complaint to the Ethics Line was made on April 25, 2000. Therefore, the "adverse action" occurred *before* Crock made the complaints.

Furthermore, evidence suggests Crock was responding to her discipline when she made the reports. Graft sent Crock an e-mail on April 18, 2000, at 9:04 a.m. She told Crock that Rhein was aware of the corrective discipline and offered to help.

Crock responded at 11:22 a.m. that Rhein's action was "window dressing" and "too little, too late". Crock filed her complaint later that afternoon with Human Resources. A few days later, Crock told Thomas that she filed a complaint with the Ethics Line and said now people would be nicer to her to "cover their butts". This sequence of events is fundamentally inconsistent with a claim of retaliation on the part of the Defendants.

■ Crock asserts her poor performance reviews and eventual discharge constitute adverse employment action. Crock feels Sears' failure to satisfy all her requests constitutes adverse employment action. However, poor performance reviews or failure to accommodate an employee's requests does not constitute "adverse" employment action. *See Cossette*, 188 F.3d at 972 (finding a negative evaluation which resulted "in a loss of status or prestige without any material change in [employee's] salary, position, or duties", by itself, did not constitute adverse employment action because it did not result in a " 'tangible change in duties or working conditions' ") (quoting *Manning*, 127 F.3d at 692); *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir.1997) (" '[N]ot everything that makes an employee unhappy is an actionable adverse action.' ") (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996)).

■ The record indicates that after Crock complained to Human Resources, Sears accommodated most of her requests. Crock was taken off the EMS project because she felt she could not meet Christopher's demands. Crock felt she should be part of the Des Moines web center team and asked to have Holloway assigned as her new supervisor because she thought he was fair. As soon as she requested a specifically configured desk, she was given the desk. Holloway allowed Crock to choose Monday as the day she came in late because she felt she could perform better. Holloway did deny Crock's request to work from home and her request for a transfer. She wanted to be transferred to a retail location while retaining her benefits. However, the same benefits package was not available to sales personnel. Crock was eventually discharged because she failed to return to work after she was medically discharged to return. Sears' decision not to give Crock all she requested cannot be construed as "adverse actions". *See Lidge–Myrtil v. Deere & Co.*, 49 F.3d 1308, 1312 (8th Cir.1995) (finding courts "do not sit to determine if [the employer's] reason is based on sound principles of business judgment"); *Enowmbitang v. Seagate Tech., Inc.*, 148 F.3d 970, 973 (8th Cir.1998) (finding an employer's decision to give employees certain pieces of equipment is a business decision that is not susceptible to judicial oversight).

### 3. Hostile Work Environment

Crock asserts Sears subjected her to a hostile work environment. However, the Eighth Circuit has " 'never recognized an ADA [or Rehabilitation Act] claim based on a hostile work environment.' " *Jeseritz v. Potter*, 282 F.3d 542, 547 (8th Cir.2002) (quoting *Wallin v. Minn. Dep't of Corrs.*, 153 F.3d 681, 687 (8th Cir.1998)). In *Jeseritz*, the Eighth Circuit assumed, without deciding, if such a claim could be maintained, the analysis would be similar to the analysis of a Title VII claim. *Id.*

■ Applying the same analysis here, Crock would have to prove (1) she was the target of severe or pervasive harassment on account of her disability; (2) the harassment affected a term, condition, or privilege of her employment; and (3) Sears knew or should have known of the disability harassment and failed to take adequate remedial measures. *Woodland*

*v. Joseph T. Ryerson & Son, Inc.,* 302 F.3d 839, 843 (8th Cir.2002).

■ The determination of a hostile environment rests on whether a reasonable person would find the alleged conduct was so severe and pervasive as to create a hostile or abusive workplace. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. 367. "Merely offensive conduct is not enough absent the requisite effect on the terms or conditions of employment. Title VII does not 'impose a code of workplace civility.'" *Woodland,* 302 F.3d at 843 (quoting *Palesch v. Mo. Comm'n on Human Rights,* 233 F.3d 560, 567 (8th Cir. 2000)).

■ Crock alleges "clear evidence" that she was the target of severe and pervasive harassment because of her disability. She offers that dismantling her desk and having her personal items thrown away[12] constitutes clear evidence. As further evidence of hostility, Crock alleges she asked to meet with Rhein to disclose to him that she had a disability; Crock alleges Rhein responded by arguing with her. She alleges this harassment continued even after Rhein was aware of her disability, as evidenced by Rhein failing to include Crock in meetings, allowing and encouraging other employees to yell and scream at her, ignoring her, and facilitating negative comments about her.

However, Crock's allegations are not supported by her own testimony and are contradicted by other evidence in the record, thereby failing to generate a genuine issue of material fact.

Crock alleges Rhein had her desk moved five times; however, she also testified she was given several double desks but found some were not appropriate for various reasons. Arguably, at least one of the desk moves was at Crock's own request. Furthermore, Christopher, Hoehne, Holloway, Graft, and Rhein all testified that everyone's desk on the floor of the web center was moved several times to accommodate the growing staff. The desk moves Crock had to endure do not rise to the level of severe or pervasive. *See Leland v. U.S. Bank Nat'l Ass'n,* 1999 WL 778569 (D.Or. 1999) (finding an HIV positive employee whose desk was moved away from former teammates because of newly assigned work groups did not rise to the level of severe or pervasive).

Crock only cites one meeting at which she believes others were allowed to "yell" at her. As such, a single incident would not rise to the level of severe or pervasive. Crock alleges Rhein excluded her from management meetings; however, Christopher testified that some of those meetings did not involve Crock's projects and were not necessary for Crock to do her job. Crock's general allegations fail to generate an issue regarding these management meetings and the creation of a hostile or abusive work place.

Crock alleges these things happened on a daily basis, yet she offers a short list of single incidents which do not rise to the level of severe or pervasive. Furthermore, even if Rhein did the things Crock alleges, Crock fails to connect how any of

---

**12.** Crock alleges that during one of the desk moves her personal belongings where placed in a wastebasket.

this conduct constitutes disability-based animus.

Crock cannot generate a jury question simply by making allegations and stating there is "ample evidence in the record". To survive a motion for summary judgment, Crock must designate "'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)). Crock fails the first prong of a hostile working environment burden-shifting analysis.

■■■ Crock also fails to show that Sears did not take remedial action. The Ethics Line log details a lengthy account of Crock's complaints and indicates several persons from the Ethics Line, Human Resources, and associate relations evaluated the situation and found Crock's claims were unsubstantiated. The law does not provide a cause of action based solely on the plaintiff's disappointment with the result of the inquiry.

Assuming without deciding the Eighth Circuit recognizes a hostile work environment claim under the ADA, Crock cannot establish a prima facie case against Sears. Summary judgment must be granted as a matter of law.

■■■ Crock is also unable to maintain a claim against Scott Rhein in his individual capacity under Title VII. *Spencer v. Ripley County State Bank*, 123 F.3d 690, 691 (8th Cir.1997) (establishing that individual employees are not personally liable under Title VII); *see also Bonomolo–Hagen v. Clay Cent.-Everly Cmty. Sch. Dist.*, 121 F.3d 446, 447 (8th Cir.1997) (per curium) (finding that the law of the Eighth Circuit was established in *Spencer v. Ripley County State Bank* which "squarely held that supervisors may not be held individually liable under Title VII").

■■■ Similarly, given the facts of this case, Crock is unable to maintain an individual claim of retaliation against Rhein under the ICRA. *Van Horn v. Specialized Support Servs., Inc.*, 241 F.Supp.2d 994, 1016 (S.D.Iowa 2003) ("Supervisors may be held liable in their individual capacity if they are 'in a position to control the company's hiring decisions.'") (quoting *Vivian v. Madison*, 601 N.W.2d 872, 876 (Iowa 1999)). Although Rhein was a supervisor, he did not have the capacity to "control" Sears' hiring or firing; therefore, the statutory liability is borne solely by Sears. *Bales v. Wal–Mart Stores, Inc.*, 143 F.3d 1103, 1111 (8th Cir.1998).

## IV. CONCLUSION

On the foregoing analysis, the Defendants' Motion for Summary Judgment on Counts I, II, and III (Clerk's No. 15) is **granted**. On agreement of the parties, the Court dismisses Counts IV and V. The case is **dismissed**.

**IT IS SO ORDERED.**